**No. 21-1919**

# In the United States Court of Appeals for the Fourth Circuit

—————————

Neuhtah Opiotennione, individually and on behalf of others similarly situated,
*Plaintiff-Appellant,*

v.

Bozzuto Management Co., et al.,
*Defendants-Appellees.*

—————————

On Appeal from the United States District Court
for the District of Maryland
Case No. 8:20-cv-01956-PJM (The Honorable Peter J. Messitte)

—————————

## OPENING BRIEF OF PLAINTIFF-APPELLANT

—————————

Matthew K. Handley
Rachel Nadas
Handley Farah & Anderson PLLC
200 Massachusetts Avenue NW,
7th Floor
Washington, DC 20001
(202) 559-2411

Jonathan E. Taylor
Deepak Gupta
Peter Romer-Friedman
Linnet Davis-Stermitz
Robert Friedman
Gupta Wessler PLLC
2001 K Street, NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
jon@guptawessler.com

December 10, 2021                                    *Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

Table of authorities ................................................................................ iii

Introduction ........................................................................................... 1

Jurisdictional statement ........................................................................ 3

Statement of the issue ........................................................................... 3

Statement of the case ............................................................................ 3

    I.    Factual background ...................................................................... 3

        A.    While Ms. Opiotennione was searching for housing, the defendants prevented her from receiving Facebook ads about available properties, solely because she was too old. ........ 3

        B.    The defendants engaged in an overt, intentional, and systemic campaign of discrimination to steer older people away from their properties and attract younger tenants. ............ 5

        C.    The defedants' discriminatory advertising campaigns caused a range of harms to Ms. Opiotennione and other older people. .............................................................................. 10

        D.    Fair-housing laws have long prohibited the type of expressly discriminatory housing advertising and steering at issue here. ........................................................................... 12

        E.    As federal regulators have concluded, fair-housing laws bar the denial of housing ads on Facebook based on a protected status. ..................................................................... 16

    II.    Procedural history .............................................................. 17

        A.    Ms. Opiotennione brings suit alleging that the defendants' discriminatory advertising violates fair-housing laws. ................................................................... 17

i

B.    The district court dismisses the claims for lack of standing, reasoning that discriminatory advertising causes no harm if the information is otherwise available on the internet. ................................................................ 19

Summary of argument ................................................................ 20

Standard of review ................................................................ 23

Argument ................................................................ 23

I.    Ms. Opiotennione has suffered an Article III injury. .......................... 23

A.    Discriminatory treatment is an Article III injury. .................... 23

B.    Although unnecessary, Ms. Opiotennione also alleges that the discrimination caused additional Article III injuries. ................................................................ 30

II.    The district court's contrary conclusion is profoundly wrong and would immunize overtly discriminatory practices from liability. ................................................................ 34

Conclusion ................................................................ 39

# TABLE OF AUTHORITIES

## Cases

*24th Senatorial District Republican Committee v. Alcorn,*
  820 F.3d 624 (4th Cir. 2016) .................................................................. 23

*Adarand Constructors, Inc. v. Pena,*
  515 U.S. 200 (1995) ............................................................................... 29

*Allen v. Wright,*
  468 U.S. 737 (1984) ........................................................................ 25, 32

*Apache Bend Apartments, Ltd. v. United States Through Internal Revenue Service,*
  964 F.2d 1556 (5th Cir. 1992) ............................................................... 33

*Baehr v. Creig Northrop Team, P.C.,*
  953 F.3d 244 (4th Cir. 2020) ................................................................ 24

*Barr v. American Ass'n of Political Consultants, Inc.,*
  140 S. Ct. 2335 (2020) ................................................................... 2, 24

*Bostic v. Schaefer,*
  760 F.3d 352 (4th Cir. 2014) ................................................................ 28

*Clements v. Fashing,*
  457 U.S. 957 (1982) ............................................................................... 29

*Comer v. Cisneros,*
  37 F.3d 775 (2d Cir. 1994) ................................................................... 27

*Cooksey v. Futrell,*
  721 F.3d 226 (4th Cir. 2013) ................................................................ 26

*Corey v. Secretay, United States Department of Housing & Urban Development*
  *ex rel. Walker,*
  719 F.3d 322 (4th Cir. 2013) ................................................................ 14

*Craftwood II, Inc. v. Generac Power Systems, Inc.,*
  920 F.3d 479 (7th Cir. 2019) ................................................................ 37

*Curtis v. Propel Property Tax Funding, LLC*,
   915 F.3d 234 (4th Cir. 2019) ................................................................ 26

*Demarais v. Gurstel Chargo, P.A.*,
   869 F.3d 685 (8th Cir. 2017) ................................................................ 36

*DiCocco v. Garland*,
   — F.4th —, 2021 WL 5351720 (4th Cir. Nov. 17, 2021) ........................... 31

*Dieffenbach v. Barnes & Noble, Inc.*,
   887 F.3d 826 (7th Cir. 2018) ............................................................... 37

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
   204 F.3d 149 (4th Cir. 2000) .................................................. 24, 32, 37

*Griffin v. Department of Labor Federal Credit Union*,
   912 F.3d 649 (4th Cir. 2019) ............................................................ 30, 33

*Hassan v. City of New York*,
   804 F.3d 277 (3d Cir. 2015) ............................................................. 20, 25

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ......................................................................... 26, 30

*Heckler v. Mathews*,
   465 U.S. 728 (1984) .................................................... 2, 20, 24, 32

*Hodgson v. Approved Personnel Service, Inc.*,
   529 F.2d 760 (4th Cir. 1975) ................................................................ 14

*Kenny v. Wilson*,
   885 F.3d 280 (4th Cir. 2018) ................................................................ 23

*Kerns v. United States*,
   585 F.3d 187 (4th Cir. 2009) ................................................................ 23

*McCrary v. Runyon*,
   515 F.2d 1082 (4th Cir. 1975) .............................................................. 33

*MGM Resorts International Global Gaming Development, LLC v. Malloy*,
   861 F.3d 40 (2d Cir. 2017) ................................................................... 25

*Northeastern Florida Chapter of Associated General Contractors of America v.*
  *City of Jacksonville,*
  508 U.S. 656 (1993) ............................................................................*passim*

*Pinson v. JPMorgan Chase Bank, National Ass'n,*
  942 F.3d 1200 (11th Cir. 2019) ............................................................. 37

*Planned Parenthood of South Carolina Inc. v. Rose,*
  361 F.3d 786 (4th Cir. 2004) ................................................................. 25

*Ragin v. Harry Macklowe Real Estate Co.,*
  6 F.3d 898 (2d Cir. 1993) ...................................................................... 29

*Regents of Uniersity of California v. Bakke,*
  438 U.S. 265 (1978) ............................................................................... 29

*Rhodes v. Parklane Apartments, LLC,*
  No. 19 Civ. 1463, 2019 WL 7293398 (D. Md. Dec. 27, 2019) .................. 18

*Sandberg v. KPMG Peat Marwick, L.L.P.,*
  111 F.3d 331 (2d Cir. 1997) ................................................................... 33

*Shea v. Kerry,*
  796 F.3d 42 (D.C. Cir. 2015) ................................................................. 29

*Smith v. City of Cleveland Heights,*
  760 F.2d 720 (6th Cir. 1985) ................................................................. 33

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ............................................................................... 24

*Texas Department of Housing & Community Affairs v. Inclusive Communities*
  *Project, Inc.,*
  576 U.S. 519 (2015) ............................................................................... 13

*Time Warner Cable, Inc. v. Hudson,*
  667 F.3d 630 (5th Cir. 2012) ........................................................... 25, 30

*TransUnion LLC v. Ramirez,*
  141 S. Ct. 2190 (2021) .......................................................................2, 25

*Turner v. Fouche,*
  396 U.S. 346 (1970) .................................................................. 29

*United States v. Hunter,*
  459 F.2d 205 (4th Cir. 1972) .................................................. 14, 15

*United States v. Real Estate One, Inc.,*
  433 F. Supp. 1140 (E.D. Mich. 1977) ..................................... 15, 16

*United States v. Students Challenging Regulatory Agency Procedures,*
  412 U.S. 669 (1973) .................................................................. 37

*Village of Arlington Heights v. Metropolitan Housing Development Corp.,*
  429 U.S. 252 (1977) .............................................................. 26, 31

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,*
  425 U.S. 748 (1976) .................................................................. 26

*Warth v. Seldin,*
  422 U.S. 490 (1975) .............................................................. 31, 32

*Wikimedia Foundation v. National Security Agency,*
  857 F.3d 193 (4th Cir. 2017) .................................................... 36

*Wilson v. Glenwood Intermountain Properties, Inc.,*
  98 F.3d 590 (10th Cir. 1996) .................................................... 29

## Statutes, Ordinances, and Regulations

24 C.F.R. § 100.75(c)(3) ............................................................ 12, 14

24 C.F.R. § 100.75(c)(4) ............................................................ 12, 14

24 C.F.R. § 100.80(b)(4) .................................................................. 16

28 U.S.C. § 1291 ................................................................................ 3

28 U.S.C. § 1332(d)(2) ...................................................................... 3

28 U.S.C. § 1332(d)(6) ...................................................................... 3

42 U.S.C. § 3604(a) .................................................................... 12, 18

42 U.S.C. § 3604(c) ................................................................ 12, 13, 18

42 U.S.C. § 3604(d) ............................................................... 12, 13, 18

D.C. Code § 2-1402.21(a)(1) ................................................... 12, 13, 17

D.C. Code § 2-1402.21(a)(5) ..............................................12, 13, 17, 18

Fair Housing Advertising Guidelines, 45 Fed. Reg. 57,104 (Aug. 26, 1980) ............................................................................................15

Montgomery County Code § 27-12(a)(1) .................................... 12, 17

Montgomery County Code § 27-12(a)(2) .................................. 12, 13, 17

Montgomery County Code § 27-12(a)(3) ..................................... 12, 17

Montgomery County Code § 27-12(d)(1) ..............................12, 13, 17, 19

## Other Authorities

Brakkton Booker, *Housing Department Slaps Facebook With Discrimination Charge*, NPR (Mar. 28, 2019), https://perma.cc/5FZQ-973B..............................17

Charge of Discrimination, *Secretary, United States Department of Housing & Urban Development v. Facebook, Inc.*, FHEO No. 01-18-0323-8 (Mar. 28, 2019), https://perma.cc/R2JN-RDRL ...............................17

Julia Angwin & Terry Parris Jr., *Facebook Lets Advertisers Exclude Users by Race*, ProPublica (Oct. 28, 2016), https://perma.cc/PKJ5-GQ9F ...........................................................................................5

Statement of Interest of the United States, Doc. 48, *National Fair Housing Alliance v. Facebook*, 18-cv-2689 (S.D.N.Y. Aug. 17, 2018)............14, 15, 16, 27

## INTRODUCTION

The defendants here are housing providers that advertised available units on Facebook. But they didn't send their ads to all potentially interested Facebook users. Instead, they adopted an overtly discriminatory approach, excluding all people of a specific protected class from seeing ads for their apartment complexes. As a result, people in that class were put at a distinct disadvantage, making it harder for them to learn about, apply for, and ultimately secure suitable housing. The defendants' discriminatory treatment caused many of these people to miss out on housing opportunities that they would have pursued if only they had known about them.

Neuhtah Opiotennione is one such person. She alleges that the defendants' discriminatory advertising violated her individual rights under the fair-housing laws of Montgomery County, Maryland, and the District of Columbia, where she lives. Her position on the merits—which is shared by the federal fair-housing regulators—is that digital discrimination of this sort is just a new way to commit an old wrong.

But the district court didn't even let her get that far, dismissing her claims for lack of Article III standing. It reasoned that, because the defendants also posted the openings to pages on their own websites, and the plaintiff "was in no way prevented" from tracking down and monitoring those pages, she was unharmed by their conscious decision to steer all of their housing ads away from her on Facebook, a key platform for recruiting prospective tenants. JA99. The court cited no authority for

this rule, and the ramifications of adopting it would be disastrous. It would give companies and organizations a green light to engage in overt digital discrimination, targeting their preferred race, gender, or religion in advertising everything from job and housing openings to financial services. So long as the postings also appear on a webpage available to all, the violators would be immune from private enforcement.

Fortunately, a long line of precedent forecloses this rule. The Supreme Court "has squarely held that a plaintiff who suffers unequal treatment has standing to challenge" it, *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2355 (2020) (plurality op.), because, as the Court has "repeatedly emphasized," "discrimination itself" is a cognizable injury that confers standing on "persons who are personally denied equal treatment solely because of their membership in a disfavored group." *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984); *see Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 657 (1993) ("The 'injury in fact'" in a discrimination case "is the denial of equal treatment."); *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021) (reiterating that "discriminatory treatment" is an Article III injury). The plaintiff here fits that description. No more is needed for Article III.

Even if more were needed, however, the plaintiff has alleged it. She alleges that the discrimination stigmatized her, made her housing search more difficult, and caused her to lose out on specific apartments that she otherwise would have applied for, qualified for, and obtained. The district court's decision must be reversed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1332(d)(2) and (6). On July 20, 2021, the district court granted the defendants' motion to dismiss the first amended complaint under Rule 12(b)(1) and entered an order dismissing the complaint in its entirety. JA94–104. Ms. Opiotennione then timely filed a notice of appeal on August 18, 2021. JA105. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

When a housing provider blocks access to advertisements about available properties to an entire category of people based on a protected characteristic, in violation of anti-discrimination laws, is that discriminatory treatment immune from suit on the theory that it inflicts no harm on anybody, so nobody has standing to sue?

## STATEMENT OF THE CASE

**I.    Factual background**

**A.    While Ms. Opiotennione was searching for housing, the defendants prevented her from receiving Facebook ads about available properties, solely because she was too old.**

Neuhtah Opiotennione is a 55-year-old woman who works in the D.C. Public School system and has lived in the District of Columbia for decades. JA14. In 2018, she decided to look for rental housing. *Id.* She set a budget of $2,500 per month and sought to identify a suitable two- or three-bedroom apartment in the District of Columbia, Montgomery County, Maryland, or nearby counties. *Id.* As she began searching, Ms. Opiotennione, like other consumers, looked for available rentals both

3

online and offline. JA40. When she identified rental properties that might meet her needs, she visited them to consider whether to rent them. JA14–15.

As part of her online search, Ms. Opiotennione regularly used Facebook, which has become an important place for housing companies to advertise their apartments. *Id.* That's because they can target their advertisements to people whom Facebook has identified as searching for housing and then direct those people to the websites of their apartment complexes. JA43–44; *see also* JA22–23. Ms. Opiotennione was interested in receiving these online housing ads on Facebook "so that she could learn about, seek, apply for, and secure housing opportunities." JA14–15.

Despite her interest, Ms. Opiotennione "struggled for many months to find available and suitable housing." JA42. And in 2019, "after being unable to find suitable rental housing," she abandoned her search and bought a home instead. JA14.

It turns out, however, there *were* apartment rentals in D.C. and Montgomery County that would have met her needs and that were within her budget. But she never learned of them because housing companies consciously decided to steer their online advertising away from her and other older people. JA9–11, 14–15, 24, 40–41.

As Ms. Opiotennione later learned, Facebook made it possible for companies to show their housing advertisements to only certain Facebook users based on those users' protected statuses, such as race, age, and gender—even though it is unlawful to do so. JA19–20; *see* Julia Angwin & Terry Parris Jr., *Facebook Lets Advertisers Exclude*

*Users by Race*, ProPublica (Oct. 28, 2016), https://perma.cc/PKJ5-GQ9F. And advertisers seized this opportunity. In 2018 and 2019, the defendants, four large property-management companies, affirmatively chose to send their apartment advertisements on Facebook *only* to people 50 or younger, and in some cases *only* to people 40 or younger. JA14–15; *see also* JA10–11, 31–35. Thus, all Facebook users over the age of 50 who were in the market for housing, including Ms. Opiotennione, were completely denied the opportunity to receive the defendants' advertisements for dozens of apartment complexes in the D.C. metropolitan area. JA14, 27–30, 50.

For Ms. Opiotennione, this meant that she never learned about many suitable apartments at the defendants' properties. JA14–15, 20, 37, 41. If the defendants had not targeted their advertisements away from older people, Ms. Opiotennione would have clicked on those advertisements, been directed to and reviewed information on the defendants' property-specific websites, and applied for an apartment that met her needs and that she could afford. JA14–15, 41. Ms. Opiotennione has identified six properties of the defendants where she would have applied for and obtained an apartment had they not steered her away from that housing. JA14–15, 41–42.

## B. The defendants engaged in an overt, intentional, and systemic campaign of discrimination to steer older people away from their properties and attract younger tenants.

In many civil-rights cases, plaintiffs challenge facially neutral policies that have an adverse impact on a protected class. But not here. The defendants intentionally,

5

purposefully, and expressly sent *all* of their apartment advertisements on Facebook to younger people so that younger people would hear about their apartments and rent them and older people would not. JA9–10, 15, 20, 37, 38, 40–41, 43–44.

The defendants—Bozzuto, JBG Smith, Kettler, and Tower—collectively lease hundreds of thousands of apartments nationwide, including many in the District of Columbia and Montgomery County. JA10 & JA15–17. To fill those apartments, the defendants recruit prospective tenants with advertising campaigns that encourage people to learn about or visit their properties. *See, e.g.*, JA31–36, 69–72, 75–78, 80–81.

Advertising apartments on Facebook was an important part of the defendants' marketing and recruitment strategy. JA36, 43–44. Facebook is "a powerful tool" for advertisers since they can "target very specific populations with their ads," especially people looking for housing. JA18–19. Indeed, the defendants "knew that a significant portion of prospective tenants will only learn about the relevant apartment—and will only apply to become a tenant—if they receive a paid ad that is directed to their Facebook News Feed." JA44.

Despite knowing that prospective tenants of all ages could benefit from learning about their housing offerings on Facebook, the defendants consciously chose to prevent all older Facebook users from receiving their apartment advertisements, sending the ads only to younger Facebook users. JA40–41, 43–44. Excluding all older

users was as simple as checking a box. When the defendants created their housing advertisements, the first thing Facebook required them to do was identify the types of people to whom they wanted to send their advertisements (*i.e.*, the "audience selection"). JA19. The default audience selection was everyone 18 and older. But advertisers like the defendants could override that default and affirmatively limit the audience of their advertisements to a narrower age range—such as 22 to 40 years old—so that no one older than that could receive the advertisement. JA19–20.

The defendants did this every time they purchased advertisements for their apartment complexes in the D.C. metropolitan area in 2018 and 2019. Every time, they changed the audience selection from the non-discriminatory default (18 and older) to a younger discriminatory age range (such as 22–40 or 25–44). JA10–11, 23–24, 27–28, 34, 40–41. Moreover, because of that decision, every advertisement that the defendants published on Facebook was accompanied by a statement that it was directed to younger people. When an ad was sent only to people 22 to 40 years old, for instance, a portion of the ad labeled "Why am I seeing this ad?" would describe how the property "wants to reach people ages 22 to 40." JA10–11, 57, 60.

The complaint offers numerous examples of these ads, including the following:

***Bozzuto.*** Bozzuto targeted advertisements to younger people in the D.C. metropolitan area for at least 15 properties. JA27–28. For example, when it published

an ad about its "Central" property, it deliberately told Facebook to show the ad only to people ages 22 to 40. JA10–11. For those people, that ad would then appear like so:



*Id.* The image on the left is what a Facebook user between 22 and 40 years old would see when they received the advertisement on their "News Feed," the primary place Facebook users see ads. JA10–11, 18–20. Recipients could also see—in the "Why am I seeing this ad?" statement on the right—that "Central want[ed] to reach people ages 22 to 40." JA10–11. The complaint offers other examples of advertisements Bozzuto limited to younger Facebook users, including those for the Banks property (limited to 28–45-year-olds) and Aperture property (limited to 22–45-year-olds). JA32, 70–72.

**_JBG Smith._** Meanwhile, JBG Smith published advertisements for at least six properties that were also limited to younger Facebook users in the D.C. metropolitan area. JA29–30. As an example, it published an advertisement about its "Atlantic Plumbing" property and directed Facebook to permit only people ages 22 to 50 to see the advertisement. That ad looked like this:



JA33; *see also* JA75 (similar ad for "1221 Van" property, shown only to 24–45-year-olds).

**Kettler.** Kettler, too, steered advertisements for at least five properties solely to younger Facebook users in the same area. JA28–29. For instance, it published the ad shown below for its "Solaire Bethesda" property only to people ages 21 to 50.



JA33; *see also* JA78 (similar ad for "The George," shown only to 18–50-year-olds).

**Tower.** Tower also published advertisements for at least two properties only to younger Facebook users in the D.C. metro area. JA30. When it published an ad about its "Blairs" property, for example, it limited to ad to people ages 25 to 44. JA34.

9

 

JA34; *see also* JA81 (similar ad for the "Pearl," shown only to 25–50-year-olds).

These discriminatory advertisements were not outliers. All of the defendants' housing advertisements on Facebook were targeted only to younger people, meaning that all older people were denied the opportunity to receive them. JA14–15, 40–41.

## C. The defendants' discriminatory advertising campaigns caused a range of harms to Ms. Opiotennione and other older people.

The defendants' facially discriminatory advertising campaigns had a significant impact on Ms. Opiotennione and other older people who were seeking housing and were categorically denied the defendants' housing advertisements.

*First*, by targeting advertisements only to younger people, the defendants denied critical information about available housing to older people who were searching for housing. This information, which they have a right to receive on equal terms as younger people, would have allowed them to learn about and apply for apartments and inform them about the housing market for such rentals. JA41, 44–45.

10

*Second*, denying housing advertisements to older people made it harder for them to compete for or obtain the rentals for which they were searching. Indeed, this practice prevented older people (including Ms. Opiotennione) from learning about or applying for apartments they otherwise would have been interested in renting. JA41, 44. Because of this practice, "fewer older people" ended up "liv[ing] at [the defendants'] properties," JA46, "resulting in an artificially high share of younger individuals than older individuals renting from [the] Defendants." JA57, 61.

Losing out on these opportunities altogether caused Ms. Opiotennione and other older people to be deprived of the "economic and non-economic benefits of such housing, such as cheaper or more affordable housing, housing that is more valuable or suitable for the same or less money, or housing that provides residents with a range of benefits of living in a particular community (access to commerce, schools, transportation, etc.)." JA45. And even for older people who might have learned about the properties through other channels, they too were harmed by the denial of the defendants' Facebook ads. They lost out on "deals or discounts—such as a month of free rent—that are only available at certain times" when those ads are running. JA44–45. Or they missed out on desirable units that were available on the market only at certain times—a common occurrence in the hot rental market in the D.C. metropolitan area, where securing a unit "typically requires acting quickly to secure an available vacancy." JA43–45.

11

For Ms. Opiotennione, this discrimination increased the time it took her to search for and secure housing. JA42. She lost out on the opportunity to learn about and apply for suitable apartments at six properties of the defendants—apartments she would have rented in the absence of this discrimination. JA41–42.

*Third*, subjecting Ms. Opiotennione to discrimination caused stigmatic harm. JA45. The defendants "segregated, classified, and treated" Ms. Opiotennione and other older people "in an unequal manner" because of their age and "perpetuated archaic and stereotypic notions about the undesirability of older persons and stigmatized older persons as innately inferior and less worthy of renting to." *Id*.

## D. Fair-housing laws have long prohibited the type of expressly discriminatory housing advertising and steering at issue here.

For half a century, the type of conduct at issue here—expressly discriminatory advertising and steering based on protected status—has been illegal under federal, state, and local law. *See* 42 U.S.C. §§ 3604(a), (c), (d); 24 C.F.R. § 100.75(c)(3)–(4); D.C. Code §§ 2-1402.21(a)(1), (a)(5); Montgomery County Code §§ 27-12(a)(1)-(3), (d)(1).

The federal Fair Housing Act and state and local laws patterned on it, like the D.C. Human Rights Act and Montgomery County Code, prohibit a broad range of practices. They bar discriminatory rejections of renters and "otherwise" making housing unavailable on a discriminatory basis. 42 U.S.C. § 3604(a); *see* D.C. Code § 2-1402.21(a)(1); MCC §§ 27-12(a)(1), (3). They bar advertising housing in a way that indicates a preference based on a protected status. 42 U.S.C. § 3604(c); D.C. Code

§ 2-1402.21(a)(5); MCC § 27-12(d)(1). And they bar misrepresentations about housing availability. 42 U.S.C. § 3604(d); D.C. Code § 2-1402.21(a)(1); MCC § 27-12(a)(2).

When Congress enacted the Fair Housing Act in 1968, it aimed to dismantle decades of practices intended "to encourage and maintain the separation of the races." *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 529 (2015). This landmark civil-rights law—whose provisions D.C. and Montgomery County adopted shortly thereafter (while extending the provisions to prohibit age discrimination)—was enacted in part to outlaw the widespread practice of real-estate agents and housing providers "steering" away renters or buyers from properties in certain areas to reinforce "racially homogenous areas." *Id.*

One form of steering that Congress specifically banned was the advertising of housing in a way that discourages or deters people from pursuing housing based on a protected trait. Thus, section 3604(c) of the Fair Housing Act bans the making, printing, or publishing of (or "causing" of the same) "any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination" based on a protected status. 42 U.S.C. § 3604(c); *accord* D.C. Code § 2-1402.21(a)(5); MCC § 27-12(d)(1). To establish a violation of this provision, a plaintiff need not show intentional discrimination or an improper "motivation"—only that an "ordinary" reader "would believe" that the ad "suggests

a preference, limitation, or discrimination based on a protected status." *Corey v. Sec'y, U.S. Dep't of Hous. & Urb. Dev. ex rel. Walker*, 719 F.3d 322, 326 (4th Cir. 2013).

There are two ways that advertising can indicate a preference, limitation, or discrimination. First, an ad's *content* can indicate a preference through words or phrases that suggest—expressly or implicitly—to an ordinary reader that an advertiser prefers to rent or sell based on a protected status. *See United States v. Hunter*, 459 F.2d 205, 215 (4th Cir. 1972) (holding that the phrase "white home" indicated that white tenants were preferred); *cf. Hodgson v. Approved Pers. Serv., Inc.*, 529 F.2d 760, 764–66 (4th Cir. 1975) (holding that a job ad that refers to "age 25 to 35" "in reference to a specific . . . opportunity" indicates a preference based on age in violation of a similarly worded provision of the Age Discrimination in Employment Act).

Second, as the U.S. Department of Justice has recently explained—in a case involving the same kind of practice at issue here—"unlawful discrimination can occur through the choice of who receives an ad, regardless of whether the content of the ad itself is facially discriminatory." Statement of Interest of the United States at 10, Doc. 48, *Nat'l Fair Housing Alliance v. Facebook*, 18-cv-2689 (S.D.N.Y. Aug. 17, 2018) (U.S. Statement of Interest). Irrespective of an ad's content, an advertisement campaign unlawfully indicates a preference when it is targeted to people based on a protected class or a proxy for one, like a predominantly white geographic area or publications mainly read by a certain protected class. *See* 24 C.F.R. § 100.75(c)(3)–(4)

14

(HUD regulations explaining that it is unlawful to "[s]elect[] media or locations for advertising the [] rental of dwellings which deny particular segments of the housing market information about housing opportunities because of [protected statuses]" or to "[r]efus[e] to publish advertising for the sale or rental of dwellings . . . because of [protected statuses]." Thus, a "violation occurs whenever the advertiser determines the manner for advertising because of the [protected status] of persons who receive or do not receive a publication." U.S. Statement of Interest at 10 (quoting Fair Housing Advertising Guidelines, 45 Fed. Reg. 57,104 (Aug. 26, 1980)).

These rules barring targeted housing advertising have the same force whether the medium is Facebook or a newspaper. As this Court observed, "the congressional prohibition of discriminatory advertisements was intended to apply to newspapers as well as *any other publishing medium*," *Hunter*, 459 F.2d at 211 (emphasis added).

For example, in the 1970s a housing company violated the Fair Housing Act by advertising in a newspaper that was read primarily by one racial group "without counter-balancing advertisements . . . in newspapers with primary circulation" of another racial group. *United States v. Real Est. One, Inc.*, 433 F. Supp. 1140, 1152 (E.D. Mich. 1977). This was illegal even though the advertiser also published ads in papers with a more general, diverse audience. *Id.* at 1151–52. Targeted advertising was considered an illegal form of "steering" because it influences, delays, and discourages

people from pursuing housing based on a protected status. *Id.* at 1144, 1152 ("[T]he racial steering effect" of the "advertising policy is a violation of the law.").

### E.    As federal regulators have concluded, fair-housing laws bar the denial of housing ads on Facebook based on a protected status.

Recently, as housing advertising has moved online, the agencies that interpret and enforce fair housing laws have concluded that it is unlawful to target housing advertisements on Facebook away from a group of people based on their protected status. In 2018, when a fair-housing group challenged the denial of housing advertisements to Facebook users based on their protected statuses, the Department of Justice explained that this new, digital form of targeted advertising violates the Fair Housing Act's ban on discriminatory advertising. "To define the audience for an ad, and to publish an ad only to that audience, can 'cause' a discriminatory statement or advertisement to be both 'made' and 'published,'" in violation of the law. U.S. Statement of Interest at 11–12 (citing cases for support). It also found that the same conduct violates section 3604(d)'s ban on misrepresentations about the availability of housing, because such targeted advertising "'limit[s] information, by word or conduct, regarding suitably priced dwellings available for . . . rental, because of'" protected status. *Id.* at 12 (quoting 24 C.F.R. § 100.80(b)(4)). Likewise, it concluded that "excluding certain demographics from even seeing an ad for a housing opportunity" "plainly 'makes' it 'unavailable,'" in violation of section 3604(a). *Id.*

Less than a year later, relying on the same reasoning, the U.S. Department of Housing and Urban Development filed a charge finding that the same practice at issue here violates the Fair Housing Act. *See* Charge of Discrimination, *Secretary, U.S. Dep't of Hous. & Urb. Dev. v. Facebook, Inc.*, FHEO No. 01-18-0323-8 (Mar. 28, 2019), https://perma.cc/R2JN-RDRL. It explained that denying housing ads to Facebook users based on their protected statuses violates several provisions of the Act, including sections 3604(a) and (c). *Id.* at 4–6. As Secretary Ben Carson put it: These digital tools "discriminat[e] against people based upon who they are," and "[u]sing a computer to limit a person's housing choices can be just as discriminatory as slamming a door in someone's face." Brakkton Booker, *Housing Department Slaps Facebook With Discrimination Charge*, NPR (Mar. 28, 2019), https://perma.cc/5FZQ-973B.

## II. Procedural history

### A. Ms. Opiotennione brings suit alleging that the defendants' discriminatory advertising violates fair-housing laws.

To redress her discriminatory treatment, Ms. Opiotennione filed this putative class action challenging the defendants' conduct under the D.C. and Montgomery County fair-housing laws. Her claims are indistinguishable from the claims that HUD filed in 2019 and that DOJ found to have merit in *National Fair Housing Alliance*.[1]

---

[1] The only difference is that the District of Columbia and Montgomery County fair-housing laws prohibit *age* discrimination, while the Fair Housing Act does not. *Compare* D.C. Code § 2-1402.21(a)(1), (5), and MCC §§ 27-12(a)(1)-(3), (d)(1), *with*

*First*, she alleges that the defendants violated D.C. and Montgomery County's bar on publishing housing ads that indicate a preference based on age. Because the defendants chose to exclude her and other older prospective tenants from receiving their ads, these advertisements indicated a preference based on age. JA55–56, 58–59.

*Second*, she alleges that by excluding older people from receiving the ads, the defendants also violated the bar on denying housing, making housing unavailable, or making misrepresentations about the availability of housing, the local equivalents of sections 3604(a) and (d) of the Fair Housing Act. The defendants' discriminatory treatment in steering older people away from housing causes them to be denied housing opportunities that are instead given to younger people. JA55, 57–58, 61–62.

In addition, Ms. Opiotennione alleges that the defendants violated the ban on discriminatory advertising in other ways when they told Facebook that they wanted to send their housing advertisements only to younger people. By changing the age range from the 18+ default to a narrower range like 22 to 40, they indicated an age-based preference for the tenants they wanted to recruit. JA57, 60; *see* D.C. Code § 2-1402.21(a)(5); MCC § 27-12(d)(1) (applying the ban to "any" "notice" or "statement"—

---

42 U.S.C. § 3604(a), (c), (d). But this does not affect the resolution of the claims. Likewise, there is no basis to interpret District of Columbia and Montgomery County fair-housing laws differently than the Fair Housing Act, since their relevant provisions contain identical or nearly identical language. *See Rhodes v. Parklane Apartments, LLC*, No. 19 Civ. 1463, 2019 WL 7293398, at *3 (D. Md. Dec. 27, 2019).

not just ads). And they caused their ads to contain age-based statements in the "Why am I seeing this ad?" portion of the ads. JA56, 60. Those statements further indicate a preference or discrimination based on age by stating that the defendants want to reach people only if they are under a certain age. JA10–11, 56, 60.

Besides her fair-housing claims, Ms. Opiotennione also brings a claim under the D.C. Consumer Protection Procedures Act. She asserts that, by violating D.C.'s fair-housing provisions, the defendants also violated this statute. JA63–64.

### B.     The district court dismisses the claims for lack of standing, reasoning that discriminatory advertising causes no harm if the information is otherwise available on the internet.

The district court dismissed Ms. Opiotennione's claims under Rule 12(b)(1), concluding that she did not allege a cognizable injury and thus lacked standing. JA94.

The court's central rationale was that, because the defendants also posted the housing information to pages on their websites, and Ms. Opiotennione "was in no way prevented" from finding, accessing, and continually monitoring those pages for potential openings and deals, she was unharmed by their discrimination against her. JA99. The court said that it "can only assume" that these ads have no effect on consumer behavior, and mused that "[w]hen there are ten roughly equal paths to the same destination and an individual has access to nine [of] them"—figures it plucked from thin air—"that individual is hardly" injured by the discrimination. JA101. Finally, the court thought that Ms. Opiotennione's allegation of being unable

to obtain housing in 2018 and 2019 was "highly conjectural," and that her allegation of stigmatic injury was also insufficient for a different reason: because "there is no suggestion" that people "other than Plaintiff" knew they were discriminated against, and because she did not detail "how she ultimately became aware of" the discrimination against her. JA100–01.

## SUMMARY OF ARGUMENT

**I.A.** To have standing, the plaintiff must allege an injury that is particularized and concrete. Ms. Opiotennione alleges that she is injured because the defendants expressly discriminated against her, in violation of her individual rights, by excluding her from receiving pertinent information about available housing. That injury is particularized because it affects her in a personal and individual way.

It is also concrete. The Supreme Court has "repeatedly emphasized" that "discrimination itself" is a concrete injury sufficient to confer standing on "persons who are personally denied equal treatment solely because of their membership in a disfavored group." *Mathews*, 465 U.S. at 739–40; *see also City of Jacksonville*, 508 U.S. at 657 ("The 'injury in fact'" in a discrimination case "is the denial of equal treatment."). Over the years, "virtually every circuit court has reaffirmed—as has the Supreme Court—that a discriminatory classification is itself a penalty, and thus qualifies as an actual injury for standing purposes, where a citizen's right to equal treatment is at stake." *Hassan v. City of New York*, 804 F.3d 277, 289–90 (3d Cir. 2015) (cleaned up).

So it does here. Ms. Opiotennione alleges that, while looking for housing, she was personally subjected to policies that discriminated against her in violation of her rights. That is a concrete injury—and one that the fair-housing laws were enacted to prevent. Further, the discriminatory treatment that she experienced implicates vital interests that are undoubtedly concrete: access to, and information about, housing.

When a defendant has "erect[ed] a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group [may sue] to challenge the barrier." *City of Jacksonville*, 508 U.S. at 666. Their standing is based on "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.* For that reason, the plaintiff "need not allege that [she] would have obtained the benefit but for the barrier in order to establish standing"—only that it "prevented [her] from competing on an equal footing in [her] quest for a benefit." *Id.* at 666–67.

Applying that rule here, Ms. Opiotennione need only allege that, but for the defendants' discrimination, she would have had the same chance of receiving their housing advertisements as younger people—and hence the same access to housing opportunities and information about them. She has done that. No more is required.

**I.B.** Even if more were required for a concrete injury, Ms. Opiotennione has amply alleged it. She alleges that she was denied equal access to information about available housing, which is a concrete injury. She alleges that this denial of equal

access caused her to miss out on at least six particular housing opportunities that she otherwise would have applied to, qualified for, and obtained, which is also a concrete injury. And she alleges that the denial of equal treatment—personally subjecting her to discrimination because of her age—signaled that her age made her less desirable and thus caused her stigmatic harm, which is yet another concrete injury.

**II.** The district court's conclusion that she suffered no injury is indefensible. The court reasoned that, because the housing information also appeared on the defendants' websites, their discrimination couldn't cause any cognizable harm. And the court did so even though Ms. Opiotennione alleges that she was stigmatized and was denied specific housing opportunities, and information about them, as a result.

But the rule is clear: Discriminatory treatment is itself a cognizable injury. That doesn't change just because Ms. Opiotennione was not also "prevented" from searching for and locating the information on the defendants' websites. JA99. Under Supreme Court precedent, the question is not whether she was entirely prevented from discovering the available properties and applying for them, but whether she has plausibly alleged that she less likely to be able to so because of a protected status.

The district court also ran afoul of the motion-to-dismiss standard. It said that it could "only assume that most prospective tenants go directly to a rental company's website," and that "[w]hen there are ten roughly equal paths to the same destination

and an individual has access to nine [of] them," there is no injury. JA101. But such baseless factual assumptions offer no grounds for dismissing a complaint.

Finally, the district court's reasoning—which is neither limited to the housing context nor age discrimination—would have intolerable consequences. It would shield even the most blatant forms of digital discrimination from private enforcement so long as the information is available to everyone somewhere else on the internet.

## STANDARD OF REVIEW

This Court reviews de novo the district court's decision to dismiss for lack of standing. *24th Senatorial Dist. Republican Comm. v. Alcorn*, 820 F.3d 624, 628 (4th Cir. 2016). Where, as here, the defendants contend "that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based," the plaintiff is "afforded the same procedural protection" that she would receive under Rule 12(b)(6): The "facts alleged in the complaint are taken as true," and the defendants' challenge "must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (cleaned up).

## ARGUMENT

## I.    Ms. Opiotennione has suffered an Article III injury.

### A.    Discriminatory treatment is an Article III injury.

Article III standing requires an injury in fact. This "requirement ensures that plaintiffs have a personal stake in the outcome of the controversy," *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018) (cleaned up), and are not seeking "to vindicate an

interest common to the entire public," based on "generalized grievances," *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 156 (4th Cir. 2000) (en banc).

The requirement has two components: The injury must be particularized, and it must be concrete. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339–40 (2016). "An injury is particularized if it affects the plaintiff in a personal and individual way." *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020) (cleaned up). "And an injury is concrete if it is *de facto*—that is, if it actually exists." *Id.* (cleaned up).

There is no dispute that Ms. Opiotennione has suffered a particularized injury. She alleges that the defendants expressly discriminated against *her*, in violation of *her* individual rights, by excluding *her* from receiving pertinent information about available housing, based on a protected characteristic of *hers*. That injury affects her in a personal and individual way. So the only question is whether it is also "concrete."

That question has long been resolved. For decades, the Supreme Court "has squarely held that a plaintiff who suffers unequal treatment has standing to challenge" the unequal treatment as unlawful and obtain redress for it. *Barr*, 140 S. Ct. at 2355 (op. of Kavanaugh, J.) (citing *Heckler*, 465 U.S. at 737–40, and *City of Jacksonville*, 508 U.S. at 666 ). That is because, as the Court has "repeatedly emphasized," "discrimination itself" is a cognizable injury sufficient to support a lawsuit by "persons who are personally denied equal treatment solely because of their membership in a disfavored group." *Mathews*, 465 U.S. at 739–40; *see also City of*

24

*Jacksonville*, 508 U.S. at 657 ("The 'injury in fact'" in a discrimination case "is the denial of equal treatment."); *Allen v. Wright*, 468 U.S. 737, 757 n.22 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) (reaffirming that, when a plaintiff has been "personally subject to discriminatory treatment," she has suffered a "judicially cognizable" harm).

In keeping with this longstanding precedent, "virtually every circuit court has reaffirmed—as has the Supreme Court—that a discriminatory classification is itself a penalty, and thus qualifies as an actual injury for standing purposes, where a citizen's right to equal treatment is at stake." *Hassan*, 804 F.3d at 289–90 (cleaned up); *see, e.g.*, *Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786, 790 (4th Cir. 2004) (op. of Michael, J.) ("Discriminatory treatment is . . . an actual injury for standing purposes."); *MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy*, 861 F.3d 40, 51 (2d Cir. 2017) ("[O]nce a plaintiff is subject to a discriminatory classification, he has standing to bring suit."); *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 636 (5th Cir. 2012) ("Discriminatory treatment . . . is an injury long recognized as judicially cognizable."). Indeed, just this past Term, the Supreme Court did so once again, reiterating that "discriminatory treatment" is an Article III injury—full stop. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021).

This line of precedent controls this case. Ms. Opiotennione alleges that, at a time when she was looking for housing, she was subjected to discriminatory policies

that classified and treated her unequally based on a protected characteristic of hers, in violation of her rights. No more is needed to plead a concrete injury.

"For purposes of standing, [this Court] must assume [that her] claim has legal validity." *Cooksey v. Futrell*, 721 F.3d 226, 239 (4th Cir. 2013) (quotation marks omitted). And as this Court has recognized, "the concreteness requirement is met where the plaintiff can show that the harm that [she] suffer[ed] as a result of a defendant's statutory violation is the type of harm [that the legislative body] sought to prevent when it enacted the statute." *Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 240–41 (4th Cir. 2019) (quotation marks omitted). Ms. Opiotennione has done this. The anti-discrimination laws in this case exist to protect the residents of the District of Columbia and Montgomery County from unequal treatment, based on a protected characteristic, with respect to housing and the advertising of housing. A person who suffers this exact harm has standing to challenge the unequal treatment.

The unequal treatment that Ms. Opiotennione suffered, moreover, implicates interests that are themselves concrete: access to, and information about, housing. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977) (finding standing where the plaintiff's "quest for housing" was impeded by discrimination); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373–74 (1982) (finding standing where the plaintiff was denied "truthful information concerning the availability of housing"); *cf. Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 763 (1976) ("[A]

consumer's interest" in receiving "commercial information" via ads "may be as keen, if not keener by far, than his interest in the day's most urgent political debate."). Indeed, her position on the merits is that the laws in this case recognize that equal access to *information* about housing opportunities is a necessary predicate to equal access to the opportunities themselves. Accordingly, they prohibit companies from excluding people, based on a protected characteristic, from receiving housing advertisements. That theory must be accepted as true at this point. And her theory, in any event, has been fully embraced by federal fair-housing regulators. *See, e.g.*, U.S. Statement of Interest at 10–12 (explaining DOJ's position that "unlawful discrimination can occur through the choice of who receives an ad," because it "limit[s]" information based on protected status, and that a "violation occurs whenever the advertiser determines the manner for advertising because of the [protected status] of persons who receive or do not receive a publication").

Consistent with her theory on the merits, Ms. Opiotennione alleges that, "by deliberately failing to provide a free flow of housing information," the defendants "erected a barrier that makes it more difficult" for older people to apply for, and obtain, housing—a cognizable injury. *Comer v. Cisneros*, 37 F.3d 775, 791 (2d Cir. 1994). As the complaint puts it: "When older individuals like Ms. Opiotennione" are categorically excluded from receiving pertinent "housing ad[s] from the defendants on Facebook or other platforms, they often will not know about the specific housing

27

opportunities (including specific[] deals or discounts) or they will be more likely to apply at a later time than younger individuals who received the housing ad." JA44–45. Thus, they "will lose out on the housing opportunity" or wind up with "more expensive or inferior housing." *Id.*; *see also* JA57, 61.

That is a far cry from the kind of generalized grievance that is too abstract to support standing. When a defendant has "erect[ed] a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group [may sue] to challenge the barrier." *City of Jacksonville*, 508 U.S. at 666; *see also Bostic v. Schaefer*, 760 F.3d 352, 372 (4th Cir. 2014) (same). Their standing is based on "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *City of Jacksonville*, 508 U.S. at 666. For that reason, the plaintiff "need not allege that [she] would have obtained the benefit but for the barrier in order to establish standing." *Id.* The "'injury in fact' is the inability to compete on an equal footing," and it is suffered when the plaintiff is a member of the disfavored group, was "able and ready" to seek the benefit, and was treated unequally. *Id.* A plaintiff therefore has standing when she "alleg[es] that some discriminatory classification prevented [her] from competing on an equal footing in [her] quest for a benefit." *Id.* at 667.[2]

---

[2] This rule explains why an affirmative-action plaintiff need not show that she would have been admitted to a particular program, *Regents of Univ. of Cal. v. Bakke*,

Applying that rule here is easy. Ms. Opiotennione need not allege that she would have actually obtained housing from the defendants had she received their ads, or even that she would have received the ads had the defendants not blocked her from doing so. She need only allege that, but for their discriminatory policy, she would have had the same chance of receiving the ads as younger people—and hence had the same access to the housing opportunities and information about them.

She has done just that. She alleges that the defendants' discriminatory policies blocked her from receiving information about available housing solely because of her age. That information was relevant to her because she could have applied to, and qualified for, the advertised properties. *See* JA14–15, 41–42 (alleging that she would have done just that for six advertised properties); *Wilson v. Glenwood Intermountain Props., Inc.*, 98 F.3d 590, 593 (10th Cir. 1996) (taking the view that "discrimination does not deprive [a] person of the ability to compete [if] she is disqualified from competing for other, legitimate reasons"). Nor was she an inactive Facebook user or someone wholly uninterested in housing opportunities. JA14–15, 40–42; *but see Ragin v. Harry Macklowe Real Est. Co.*, 6 F.3d 898, 904 (2d Cir. 1993) (finding standing based on

---

438 U.S. 265, 281 n.14 (1978) (Powell, J.); *Shea v. Kerry*, 796 F.3d 42, 50 (D.C. Cir. 2015); aspirants to office need not allege that they would have been appointed or elected absent a restriction, *Turner v. Fouche*, 396 U.S. 346, 361 n.23 (1970); *Clements v. Fashing*, 457 U.S. 957, 962 (1982); and challengers to minority set-aside programs need not show that they would have actually received public contracts but for the set-asides, *City of Jacksonville*, 508 U.S. at 666; *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995).

29

discriminatory ads even for plaintiffs who "were not actively looking for an apartment"). There is thus no basis for holding that she has failed to allege an injury.

### B.   Although unnecessary, Ms. Opiotennione also alleges that the discrimination caused additional Article III injuries.

Because the denial of equal treatment is sufficient "for standing irrespective of whether the plaintiff will sustain an actual or more palpable injury as a result of the unequal treatment," *Hudson*, 667 F.3d at 636 (quotation marks omitted), reversal is required for that reason alone. But even if Article III required an allegation of some additional harm beyond the denial of equal treatment, Ms. Opiotennione has done that in spades—from the housing opportunities that she alleges she would have applied to and qualified for but for the discrimination, to the stigma that she alleges she personally suffered as a result of the discriminatory advertisements.

***Loss of available housing opportunities and information about them.*** Ms. Opiotennione alleges that she was denied equal access to information about available housing, which is a cognizable injury. *See Havens*, 455 U.S. at 374–75; *Griffin v. Dep't of Lab. Fed. Credit Union*, 912 F.3d 649, 654 (4th Cir. 2019) ("Inability to obtain information is sufficiently concrete to constitute injury . . . when the information has some relevance to the litigant."). But she also alleges that this denial of equal access caused her to miss out on housing opportunities that she otherwise would have applied to and qualified for. Specifically, she alleges that, because of the defendants' "discriminatory advertising practices, [she] was not aware of the housing

opportunities" that they advertised on Facebook. JA15. She further alleges that, had their discriminatory practices not prevented her from receiving the ads, she "would have clicked on" them, "reviewed the information on all of the defendants' web sites to learn about their housing opportunities" in the area, and "applied for and secured a two-bedroom apartment" at one of the defendants' properties "for which she [] qualified." *Id.*; *see id.* JA41–42 (elaborating on these allegations in detail).

These allegations are sufficient to supply an independent basis for standing. The Supreme Court's decision in *Village of Arlington Heights* shows why. There, the plaintiff alleged that he lost a housing opportunity when an Illinois suburb refused to allow a parcel of land to be rezoned for affordable housing. 429 U.S. at 264. Like Ms. Opiotennione, he alleged that he would have sought and qualified for that housing if it were rezoned. *Id.* The Supreme Court held that this loss qualified as an Article IIII injury and that the plaintiff had standing to sue based on it. *Id.* The same is true here. Losing a housing opportunity is a concrete injury, and it is fairly traceable to the defendants' unlawful discrimination. *See DiCocco v. Garland*, — F.4th —, 2021 WL 5351720, at *3 (4th Cir. Nov. 17, 2021) (explaining that traceability is a "relatively modest" requirement that demands neither "but for" nor proximate causation).

To be sure, the lost opportunities must be "concrete" and "individualized." It is not enough, for instance, for plaintiffs to express an abstract desire for more housing opportunities in their community. *See Warth v. Seldin*, 422 U.S. 490, 507 (1975).

But Ms. Opiotennione is not some "roving" antidiscrimination "ombudsman seeking to right" civil-rights "wrongs wherever" she might find them. *Friends of the Earth*, 204 F.3d at 157. She is a "real person" who sought a "real home" of exactly the sort that the defendants advertised. *Id.* When plaintiffs can point to a "particular project" that "would supply housing within their means," *Warth*, 422 U.S. at 507 & n.18, or when they allege that they "would apply" for housing if a particular opportunity were available, *Allen*, 689 F.2d at 595 n.5, they easily meet the injury-in-fact requirement.

**Stigma.** Ms. Opiotennione also alleges that "[t]he defendants' discriminatory conduct perpetuated archaic and stereotypic notions about the undesirability of older persons and stigmatized older persons as innately inferior and less worthy of renting to, causing [her] stigmatic harm." JA45. This harm provides another basis for standing. *See Mathews*, 465 U.S. at 739–40 (holding that such stigmatic harms are concrete injuries for people "personally denied equal treatment solely because of their membership in a disfavored group"); *Allen*, 468 U.S. at 756–57 & n.22 (same). Ms. Opiotennione alleges that this stigma derives directly from the fact that she and other older people were personally "segregated, classified, and treated in an unequal manner," solely because of their age, when the defendants consciously steered all of their housing ads on Facebook away from older people. JA45.[3]

---

[3] Courts have held that even a plaintiff who *wasn't* personally subjected to a challenged discriminatory policy may have standing to sue based on "[t]he stigma in

"The fundamental concern of discrimination law is to redress the dignitary affront that decisions based on group characteristics represent, not to guarantee specific economic expectancies." *Sandberg v. KPMG Peat Marwick, L.L.P.*, 111 F.3d 331, 335 (2d Cir. 1997). As this Court has put it, discrimination is an "affront, of which embarrassment and humiliation are natural consequences." *McCrary v. Runyon*, 515 F.2d 1082, 1089 (4th Cir. 1975), *aff'd*, 427 U.S. 160 (1976); *see also Griffin*, 912 F.3d at 654 ("[D]ignitary harms are readily inferred" from "allegations of unequal treatment.").

There is nothing implausible about an allegation that age discrimination works the same way as discrimination based on other protected characteristics. *See Apache Bend Apartments, Ltd. v. U.S. Through I.R.S.*, 964 F.2d 1556, 1560 (5th Cir. 1992), *on reh'g*, 987 F.2d 1174 (5th Cir. 1993) (explaining that stigmatic injury arises from "discrimination based on a characteristic of the person disfavored, such as race, alienage, national origin, gender . . . [or] age," and that for Article III standing purposes, "[w]hen a plaintiff alleges that he has been personally denied equal treatment . . . he has alleged an . . . injury, regardless of the nature of the stigma that attaches to the disfavored class"). To hold otherwise would disrespect not only older people as a group, but also the legislative judgment to protect them from discrimination in the first place.

---

his own community." *Smith v. City of Cleveland Heights*, 760 F.2d 720, 723 (6th Cir. 1985). A plaintiff who *was* personally discriminated against and alleges dignitary harms as a result, like Ms. Opiotennione, has an even stronger case for stigmatic injury.

## II.    The district court's contrary conclusion is profoundly wrong and would immunize overtly discriminatory practices from liability.

In dismissing Ms. Opiotennione's claims for lack of injury, the district court did not grapple with the long line of cases holding that discriminatory treatment itself is a concrete injury. Instead, the court determined that, because the relevant housing opportunities were all (it assumed) posted on the defendants' websites, advertising campaigns that affirmatively exclude all members of a protected group cause no cognizable harm. And the court held that this is true even where, as here, a plaintiff specifically alleges that she was personally excluded, stigmatized, and denied specific housing opportunities as a result.

None of that is right. As already discussed, the rule is settled: Discriminatory treatment is itself a cognizable injury. There is no justification for creating a new exception for this case. Nor is there any authority for the district court's decision to disregard the plaintiff's alleged stigmatic injuries based on whether someone "other than Plaintiff" uncovered the discrimination, and "how she ultimately became aware of" the discrimination against her. JA101–02. What matters is not whether someone else discovered the discrimination, or how she discovered it, but whether she has plausibly alleged that she was stigmatized by it. The court ignored that question.

More fundamentally, the district court's reasoning would be a particularly unjustifiable basis on which to mint a new exception to the rule that discriminatory treatment is itself an injury. The court reasoned that, because the advertisements

34

seemed to link to pages on the defendants' websites, and because Ms. Opiotennione was not "prevented" from "running her own apartment search" and tracking down "the very same information on the same linked apartment website," she was "hardly denied the ability 'to compete on an equal footing'" or to obtain housing information on equal terms, and that she consequently did not suffer a concrete injury. JA99–101.

That is wrong for four reasons. *First*, it misunderstands the nature of the injury. The question is not whether the plaintiff was entirely "prevented" from discovering the available properties and applying for them, but whether she has plausibly alleged that she was put at a comparative disadvantage relative to similarly situated younger people because of her membership in a protected group. The answer is yes.

*Second*, the court's reasoning flunks the motion-to-dismiss standard. The court said that it could "only assume" that advertising has no effect on consumer behavior, that "most prospective tenants go directly to a rental company's website or otherwise contact the rental company directly to obtain specific information about the availability and pricing of units," and that "[w]hen there are ten roughly equal paths to the same destination and an individual has access to nine [of] them," there is no injury. JA101.

But factual assumptions of this sort have no place at the motion-to-dismiss stage. A "court cannot favor its perception of the relevant events over the narrative offered by the complaint." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th

Cir. 2017) (cleaned up). And the district court's assumptions are especially off-base because they contradict the detailed allegations of the complaint, not to mention the very existence of advertising as an industry. For example, the complaint alleges that Facebook is "a powerful tool" for advertisers because they can "target very specific populations with their ads," especially those looking for housing, JA18; that the defendants "knew that a significant portion of prospective tenants will only learn about the relevant apartment—and will only apply to become a tenant—if they receive a paid ad" on Facebook, JA44; and that the defendants considered their age-based advertising on Facebook to be an "important" part of their marketing and recruitment strategy. JA36, 43–44. And the complaint alleges that the defendants' stratagem *worked* as to Ms. Opiotennione: For her, despite searching online and offline for housing, she never learned about the defendants' properties that she would have been interested in renting. JA15, 40–41.

*Third*, the court's reasoning is also wrong on its own terms. Even assuming that Ms. Opiotennione could have scoured the internet to track down information on the same properties the defendants targeted to younger people, that just replaces one Article III injury with another. Lost time is "itself an injury." *Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685, 693 (8th Cir. 2017). So the plaintiff could not have avoided experiencing an injury simply because the defendant's conduct required her to spend more time trying to track down the same information. *See Dieffenbach v. Barnes & Noble,*

*Inc.*, 887 F.3d 826, 828 (7th Cir. 2018) ("The plaintiffs have standing" based on "the value of one's own time."); *Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, 942 F.3d 1200, 1207 (11th Cir. 2019) ("[T]ime spent . . . constitutes a concrete injury."). If the time spent reading unwanted faxes is an injury, as courts have recognized, *see Craftwood II, Inc. v. Generac Power Sys., Inc.*, 920 F.3d 479, 481 (7th Cir. 2019), the same must be true of requiring Ms. Opiotennione to spend additional time to find the defendants' websites here—and not just to find them, but to find them at the times when the defendants were offering the sorts of apartments and deals to which they denied her access on Facebook. This was a cost that similarly situated younger people who received the defendants' ads were not required to incur. "These are concrete rather than abstract losses." *Id.* Even if some might think of them as "slight," "an 'identifiable trifle' suffices" for standing *Id.* (quoting *United States v. SCRAP*, 412 U.S. 669, 689 & n.14 (1973)); *see also Friends of the Earth*, 204 F.3d at 156.

*Finally*, the ramifications of accepting the district court's reasoning would be intolerable. The court's reasoning is not limited to housing, nor age discrimination. Under the same logic, a company could, for example, advertise job postings or housing opportunities to whites only—affirmatively excluding all other races from receiving ads across social media or all digital channels—and this conduct would be immune from private enforcement so long as the company also posts the openings somewhere on its website. Or a company could do the exact same thing that the

defendants did here, but change the filter to target only straight people, or to exclude all Christians. The possibilities for discrimination with impunity would be endless.

Nor is there any coherent limiting principle that could avoid that outcome. Even taking the district court's improperly "assume[d]" figures as a given—that nine of ten paths to receive the information are equal, and only one is discriminatory—what's the basis for determining when there's an injury? If nine paths are somehow equal to ten, what about seven? Five? Fewer? The court never says, but the only path it mentioned (each defendant's website) suggests an answer: one.

The district court cited no authority for its radical rule, and it is not, and has never been, the law. When a company categorically excludes people of a certain protected group from receiving advertisements about housing (or employment, for that matter), in violation of anti-discrimination laws, it isn't immune from suit on the theory that no one is injured. To the contrary, someone like Ms. Opiotennione has always been permitted to sue for being personally subjected to unequal treatment of this sort. This Court should make clear that that is no less true today, and reverse.

## CONCLUSION

The district court's judgment should be reversed.

Respectfully submitted,

/s/ Jonathan E. Taylor
JONATHAN E. TAYLOR
DEEPAK GUPTA
PETER ROMER-FRIEDMAN
LINNET DAVIS-STERMITZ
ROBERT FRIEDMAN
GUPTA WESSLER PLLC
2001 K St, NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
jon@guptawessler.com

MATTHEW K. HANDLEY
RACHEL NADAS
HANDLEY FARAH & ANDERSON PLLC
200 Massachusetts Ave. NW, 7th Floor
Washington, DC 20001
(202) 559-2411

December 10, 2021                    *Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 9,449 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

*/s/ Jonathan E. Taylor*
Jonathan E. Taylor

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2021, I electronically filed the foregoing brief of plaintiff-appellant with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Jonathan E. Taylor*
Jonathan E. Taylor