No. 21-1919

_____

## In the United States Court of Appeals
## for the Fourth Circuit

_____

NEUHTAH OPIOTENNIONE,
**individually and on behalf of others similarly situated,**
*Plaintiff-Appellant*,
v.
BOZZUTO MANAGEMENT CO., ET AL.,
*Defendants-Appellees*.

_____

On Appeal from the United States District Court
for the District of Maryland
Case No. 8:20-cv-01956-PJM (Hon. Peter J. Messitte)

_____

## RESPONSE BRIEF OF APPELLEES

_____

Lynn E. Calkins
Christine N. Walz
Holland & Knight LLP
800 17th Street, N.W., Suite 1100
Washington, DC  20006
Telephone: (202) 955-3000
lynn.calkins@hklaw.com

*Counsel for Bozzuto*
*Management Company*


W. Christian Moffitt
Fox Rothschild LLP
10 Sentry Parkway, Suite 200
Blue Bell, PA  19422
Telephone: (610) 397-7073
cmoffit@foxrothschild.com

*Counsel for Kettler Management Inc.*

Grace E. Speights
Michael Burkhardt
Michael E. Kenneally
Morgan Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC  20004
Telephone: (202) 739-3000
grace.speights@morganlewis.com

*Counsel for JBG Smith*
*Management Services, LLC*


Michael Evan Jaffe
Jack McKay
David C. Grossman
Pillsbury Winthrop Shaw Pittman LLP
1200 17th Street, N.W.
Washington, DC  20036
Telephone: (202) 663-8068
michael.jaffe@pillsburylaw.com

*Counsel for Tower*
*Construction Group, LLC*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __21-1919__    Caption: __Opiotennione v. Bozzuto Management Company, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Bozzuto Management Company__
(name of party/amicus)

_____

 who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?    ☑ YES ☐ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

       Bozzuto & Associates, Inc.


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:


i

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?          ☑YES ☐NO
     If yes, identify entity and nature of interest:
      CHUBB

5.   Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?          ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Lynn E. Calkins (with permission)          Date:   February 15, 2022

Counsel for: Bozzuto Management Company

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>21-1919</u>        Caption: <u>Opiotennione v. Bozzuto Management Company, et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>JBG Smith Management Services, LLC</u>
(name of party/amicus)

_____

who is _____<u>Appellee</u>_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☑ YES ☐ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

      JBG SMITH Management Services, L.L.C. is a limited liability company wholly owned by JBGS/TRS, L.L.C.  JBGS/TRS, L.L.C. is wholly owned by JBG SMITH Properties LP.  JBG SMITH Properties LP is the operating partnership for JBG SMITH Properties, a real estate investment trust.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☑ YES ☐ NO
      If yes, identify all such owners:

      JBG SMITH Properties is a publicly-traded real estate investment trust.

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?          ☐YES ☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)          ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?          ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?          ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Grace E. Speights                                Date:      February 15, 2022

Counsel for: JBG Smith Management Services, LLC

iv

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __21-1919__      Caption: __Opiotennione v. Bozzuto Management Company, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Kettler Management, Inc.__
(name of party/amicus)

_____

 who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: __/s/ W. Christian Moffitt (with permission)__    Date: ___February 15, 2022___

Counsel for: __Kettler Management, Inc.___

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __21-1919__      Caption: __Opiotennione v. Bozzuto Management Company, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Tower Construction Group, LLC__
(name of party/amicus)

_____

 who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?     ☐ YES ☑ NO


2.      Does party/amicus have any parent corporations?                     ☑ YES ☐ NO
        If yes, identify all parent corporations, including all generations of parent corporations:

        Tower MD Holdings, LLC



3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                     ☐ YES ☑ NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Michael Evan Jaffe (with permission)          Date:     February 15, 2022

Counsel for:  Tower Construction Group, LLC

# **TABLE OF CONTENTS**

**Page**

DISCLOSURE STATEMENTS.................................................................. i

TABLE OF AUTHORITIES ................................................................ xi

INTRODUCTION .................................................................................1

STATEMENT OF THE ISSUES..........................................................3

STATEMENT OF THE CASE .............................................................4

I.      Plaintiff's Allegations ................................................................5

II.     Procedural History ...................................................................9

SUMMARY OF ARGUMENT ...........................................................12

STANDARD OF REVIEW .................................................................16

ARGUMENT .......................................................................................17

I.      Legal Standard to Prove Article III Standing ...............................17

II.     The District Court Properly Found Plaintiff Failed to Allege Article
        III Standing. ...........................................................................18

        A.      Plaintiff Did Not Plausibly Allege an Informational Injury
                Because She Was Not Denied Access to Any Information
                About Housing Opportunities. ...........................................18

        B.      Plaintiff Did Not Plausibly Allege Any Economic Injury. .................24

        C.      Plaintiff Did Not Plausibly Allege Stigmatic Injury. ..........................29

        D.      Plaintiff Did Not Plausibly Allege Standing Based on Living in
                an Age-Integrated Community...........................................34

III.    Plaintiff's Allegations of Discrimination Do Not Give Rise to
        Standing and Do Not State A Claim..........................................34

        A.      Plaintiff Failed to Preserve Her Argument That Merely
                Alleging Discrimination Satisfies Standing Requirements................35

        B.      Simply Alleging Discrimination Does Not Automatically Give
                Plaintiff Standing..............................................................37

        C.      Plaintiff Has Failed to Put Forward Cognizable Discrimination
                Claims, Which Further Precludes a Finding of Standing....................40

# **TABLE OF CONTENTS**
## **(continued)**

**Page**

1.  The Amended Complaint Fails to Plausibly Allege
    Discrimination Under the Montgomery County Code. ...........41

    a.  The Amended Complaint Does Not Allege That
        the Advertisements Are Discriminatory........................41

    b.  Plaintiff Fails to Make a Plausible Allegation That
        Defendants' Overall Advertising Excludes Older
        Individuals. ....................................................43

    c.  The "Why Am I Seeing This Ad" Statements Were
        Not Made by Defendants and Defendants Are Not
        Responsible for Facebook's Algorithm.........................48

2.  The Amended Complaint Fails to Plausibly Allege
    Discrimination Under the DCHRA...........................................50

IV.  Plaintiff's Policy Arguments Have No Bearing on This Case .....................52

CONCLUSION.................................................................................54

CERTIFICATE OF COMPLIANCE.......................................................55

CERTIFICATE OF SERVICE ............................................................56

x

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

CASES

*24th Senatorial Dist. Republican Comm. v. Alcorn*,
  820 F.3d 624 (4th Cir. 2016) ...............................................................16

*Adler v. Vision Lab Telecomms., Inc.*,
  393 F. Supp. 2d 35 (D.D.C. 2005) .....................................................51

*Agra, Gill & Duffus, Inc. v. Benson*,
  920 F.2d 1173 (4th Cir. 1990) ............................................................35

*Allen v. Wright*,
  468 U.S. 737 (1984)...............................................30, 33, 38, 39

*Apache Bend Apartments, Ltd. v. United States*,
  964 F.2d 1556 (5th Cir. 1992) ............................................................33

*Apache Bend Apartments, Ltd. v. United States*,
  987 F.2d 1174 (5th Cir. 1993) ............................................................33

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).............................................................................27

*Barr v. Am. Ass'n of Political Consultants, Inc.*,
  140 S. Ct. 2335 (2020)...............................................................35, 39

*Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg, N.Y.*,
  111 F. Supp. 3d 459 (S.D.N.Y. 2015) ...............................................40

*Bradley v. T-Mobile US, Inc.*,
  No. 17-CV-07232-BLF, 2020 WL 1233924 (N.D. Cal. Mar. 13, 2020) .....22, 38

*Brandywine Apartments, LLC v. McCaster*,
  964 A.2d 162 (D.C. 2009) ..................................................................51

*Burrell v. Chi. Hous. Auth.*,
  No. 03 C 8776, 2005 WL 2007155 (N.D. Ill. Aug. 22, 2005) ...........37

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*California v. Texas*,
141 S. Ct. 2104 (2021)........................................................................36

*Carter v. Duncan-Higgins, Ltd.*,
727 F.2d 1225 (D.C. Cir. 1984)........................................................34

*Charbonnages de France v. Smith*,
597 F.2d 406 (4th Cir. 1979) ...........................................................41

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)...........................................................................24

*Cole v. Wake Cty. Bd. of Educ.*,
834 F. App'x 820 (4th Cir. 2021) .....................................................36

*Corey v. Sec'y, U.S. Dep't of Hous. & Urban Dev. ex rel. Walker*,
719 F.3d 322 (4th Cir. 2013) ...........................................................42

*Craftwood II, Inc. v. Generac Power Sys., Inc.*,
920 F.3d 479 (7th Cir. 2019) ...........................................................29

*Demarais v. Gurstel Chargo, P.A.*,
869 F.3d 685 (8th Cir. 2017) ...........................................................28

*Dieffenbach v. Barnes & Noble, Inc.*,
887 F.3d 826 (7th Cir. 2018) ...........................................................29

*Episcopal Church in S.C. v. Church Ins. Co. of Vt.*,
997 F.3d 149 (4th Cir. 2021) ...........................................................26

*Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*,
166 F.3d 642 (4th Cir. 1999) ...........................................................16

*Feemster v. BSA Ltd. P'ship*,
471 F. Supp. 2d 87 (D.D.C. 2007)....................................................51

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000)...........................................................................18

## TABLE OF AUTHORITIES
**(continued)**

**Page(s)**

*Friends of Lubavitch v. Baltimore Cnty.*,
    421 F. Supp. 3d 146 (D. Md. 2019)....................................................45

*Gomez v. Indep. Mgmt. of Del., Inc.*,
    967 A.2d 1276 (D.C. 2009) ...........................................................51

*Greengael, LC v. Bd. of Supervisors of Culpeper Cnty., Va.*,
    313 F. App'x 577 (4th Cir. 2008)....................................................37

*Griffin v. Dep't of Lab. Fed. Credit Union*,
    912 F.3d 649 (4th Cir. 2019) ....................................................21, 30

*Guevara v. UMH Props., Inc.*,
    No. 2:11-CV-2339-SHL-TMP, 2014 WL 5488918 (W.D. Tenn. Oct. 29,
    2014) ...........................................................................47

*Hall v. Virginia*,
    385 F.3d 421 (4th Cir. 2004) .........................................................26

*Hassan v. City of N.Y.*,
    804 F.3d 277 (3d Cir. 2015) ..........................................................39

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)..................................................18, 19, 21, 22

*Heckler v. Mathews*,
    465 U.S. 728 (1984)...............................................................33, 39

*Henneghan v. District of Columbia*,
    916 F. Supp. 2d 5 (D.D.C. 2013)....................................................52

*Hous. Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Div. of Gannett Co.*,
    943 F.2d 644 (6th Cir. 1991) .........................................................47

*Huron v. Cobert*,
    809 F.3d 1274 (D.C. Cir. 2016).......................................................36

*In re Navy Chaplaincy*,
    534 F.3d 756 (D.C. Cir. 2008).........................................................38

xiii

### TABLE OF AUTHORITIES
**(continued)**

**Page(s)**

*In re Under Seal*,
    749 F.3d 276 (4th Cir. 2014) ........................................................35, 36

*Kimel v. Fla. Bd. of Regents*,
    528 U.S. 62 (2000)...............................................................................40

*Laufer v. Naranda Hotels, LLC*,
    No. CV SAG-20-1974, 2020 WL 7384726 (D. Md. Dec. 16, 2020) .................37

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)........................................................................18, 23

*Martinez v. Optimus Props., LLC*,
    No. 216CV08598SVWMRW, 2017 WL 1040743 (C.D. Cal. Mar. 14, 2017)..47

*Mason v. Adams Cnty. Recorder*,
    901 F.3d 753 (6th Cir. 2018) ..............................................................37

*McCrary v. Runyon*,
    515 F.2d 1082 (4th Cir. 1975) ............................................................34

*Metro. Milwaukee Fair Hous. Council v. Labor & Indus. Rev. Comm'n*,
    496 N.W. 2d 159 (Wis. Ct. App. 1992).................................................44

*MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy*,
    861 F.3d 40 (2d Cir. 2017) ..................................................................39

*Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*,
    805 F. Supp. 2d 396 (S.D. Ohio 2011) ...............................................44

*Moore v. Bryant*,
    853 F.3d 245 (5th Cir. 2017) ..............................................................40

*NAACP v. ITT Cmty. Dev. Corp.*,
    399 F. Supp. 366 (D.D.C. 1975).........................................................47

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
    508 U.S. 656 (1993).............................................................................39

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
   591 F.3d 250 (4th Cir. 2009) ..............................................................16

*Opiotennione v. Facebook, Inc.*,
   No. 3:19-cv-07185-JSC, 2020 WL 5877667 (N.D. Cal. Oct. 2,
   2020) ...................................................................................4, 33, 38, 44

*Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*,
   942 F.3d 1200 (11th Cir. 2019) .........................................................29

*Planned Parenthood of S.C. Inc. v. Rose*,
   361 F.3d 786 (4th Cir. 2004) ..............................................................39

*Ragin v. Harry Macklowe Real Estate Co.*,
   6 F.3d 898 (2d Cir. 1993) ............................................................30, 34

*Ragin v. N.Y. Times Co.*,
   923 F.2d 995 (2d Cir. 1991) ...............................................................42

*Richardson v. Petasis*,
   160 F. Supp. 3d 88 (D.D.C. 2015) .....................................................52

*Schlesinger v. Reservists Comm. to Stop the War*,
   418 U.S. 208 (1974) ...........................................................................52

*Smith v. City of Cleveland Heights*,
   760 F.2d 720 (6th Cir. 1985) ..............................................................32

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ...........................................................17, 18, 21

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ...........................................................................18

*Time Warner Cable, Inc. v. Hudson*,
   667 F.3d 630 (5th Cir. 2012) ..............................................................39

*United States v. Real Est. One, Inc.*,
   433 F. Supp. 1140 (E.D. Mich. 1977) ...............................................46

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Vargas v. Facebook, Inc.*,
No. 19-CV-05081-WHO, 2021 WL 3709083 (N.D. Cal. Aug. 20, 2021) ...................................................................................22, 37

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977)........................................................................25

*Warth v. Seldin*,
422 U.S. 490 (1975)....................................................16, 18, 38, 39

*Wasatch Equal. v. Alta Ski Lifts Co.*,
55 F. Supp. 3d 1351 (D. Utah 2014), *aff'd*, 820 F.3d 381 (10th Cir. 2016) ......39

*Wikimedia Found. v. Nat'l Sec. Agency*,
857 F.3d 193 (4th Cir. 2017) ...........................................................27

*Wilcox v. Lyons*,
970 F.3d 452 (4th Cir. 2020) ...........................................................40

*Wilson v. Glenwood Intermountain Props., Inc.*,
98 F.3d 590 (10th Cir. 1996) ...........................................................33

*Worsham v. Travel Options, Inc.*,
No. JKB-14-2749, 2016 WL 4592373 (D. Md. Sept. 2, 2016).........................45

**STATUTES**

D.C. Consumer Protection and Procedures Act.........................5, 7, 9, 51

D.C. Human Rights Act ..............................................................*passim*
    D.C. Code § 2-1402.21 .............................................................3, 50
    D.C. Code § 2-1402.22 .................................................................50
    D.C. Code § 2-1402.62 .................................................................50

Fair Housing Act ........................................................................*passim*
    42 U.S.C. § 3604 ........................................................................41
    42 U.S.C. § 3607 ........................................................................41

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Montgomery County Code ....................................................................*passim*
    Montgomery County Code § 27-12 ...........................................3, 42, 43

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12 ...............................................................................*passim*

Fed. R. Evid. 201 .............................................................................19, 27

U.S. Const.
    amend. I................................................................................................39
    amend. XIV.....................................................................................39, 40
    art. III ...........................................................................................*passim*

# **INTRODUCTION**

Plaintiff claims she suffered "digital housing discrimination" because of her age. She defines this concept as "the use of digital, online tools to eliminate a group of people from receiving a company's housing advertising and recruiting." JA9-10. But her Amended Complaint pleads no facts to suggest that Defendants tried to keep older individuals from learning about their properties. Her case rests instead on allegations that on a single online social-media platform—Facebook—Defendants targeted certain advertisements for Defendants' properties to users under 50 years of age. Plaintiff does not allege that the advertisements' contents were facially discriminatory. She does not allege that she, or anyone else, was ever denied housing by any Defendant because of age. She does not even allege that Defendants targeted younger audiences through other advertising channels. Rather, she advances a sweeping theory that focusing on younger age groups in any part of one's advertising strategy constitutes age discrimination.

The District Court properly dismissed the Amended Complaint for failing to allege Article III standing. The court carefully considered each of Plaintiff's four theories of standing and determined that she had failed to plausibly allege that Defendants' challenged practices caused her (1) informational injury, (2) economic harm, (3) stigmatic harm, or (4) a loss of opportunities to live in age-integrated associations. JA98-103. This was the correct conclusion. Plaintiff has never

contended that she was deceived by Defendants' advertising or that it was more challenging to find the advertised properties through other online channels. She offered no allegations about how her discovery of the alleged advertising practices led her personally to feel stigma. And she is not even in the market for rental housing anymore, as she bought a home in 2019. JA14.

Plaintiff's opening brief devotes just a few pages to the District Court's rejection of the arguments she made below. Opening Br. 30-33. She thus seems to recognize that her allegations failed to establish any of the four categories of harm that she claimed. On appeal, she shifts gears and mainly urges reversal based on a new argument: that any allegation of discriminatory treatment suffices for Article III standing. This theory of standing was not pressed or passed upon below and the Court should not entertain it.

If the Court does entertain Plaintiff's new theory, it should reject it. There is no support for the view that standing is automatically satisfied in every discrimination case—particularly not with a theory of discrimination like the one Plaintiff proposes here. She asserts violations of the laws of Montgomery County, Maryland, and the District of Columbia. But these laws do not purport to create a right to an equal probability, in every single advertising medium, of receiving information about every housing opportunity regardless of one's age. Rather, they prohibit advertisers from publishing a message that the age of a prospective resident

will affect her ability to secure housing. *See* Montgomery County Code § 27-12(d)(2); D.C. Code § 2-1402.21(a)(5).

Citing inapposite court filings by federal regulators—filings that do not discuss Article III standing or age discrimination—Plaintiff asserts that Defendants' facially nondiscriminatory advertisements violate these laws by supposedly conveying a preference for younger residents. Opening Br. 14-16, 27. But Plaintiff cannot explain how her offense at a supposed message she never received constitutes harm particularized to her, rather than a generalized grievance that cannot support standing. In any event, Plaintiff's theory of discrimination fails because neither Montgomery County nor D.C. law reaches beyond the content of the advertisements, which was unobjectionable, and Plaintiff cannot premise standing on alleged discrimination because she has failed to plausibly allege discrimination under either Montgomery County or D.C. law.

## STATEMENT OF THE ISSUES

Whether Plaintiff has demonstrated standing to sue when she makes a generalized complaint about allegedly discriminatory advertising practices but does not plausibly allege that she personally suffered an injury that is concrete and particularized as a result of those alleged advertising practices.

3

## STATEMENT OF THE CASE

Several years ago, Plaintiff Neuhtah Opiotennione unsuccessfully sued Facebook for publishing facially neutral advertisements that she and others allegedly did not receive because they fell outside of the targeted demographic. *Opiotennione v. Facebook, Inc.*, No. 3:19-cv-07185-JSC, 2020 WL 5877667, at *5 (N.D. Cal. Oct. 2, 2020). Having dismissed her lawsuit against Facebook rather than attempting to cure her lack of standing in that case,[1] Plaintiff has now sued several housing providers on similar grounds for publishing advertisements through Facebook. Specifically, she contends that Bozzuto Management Company ("Bozzuto"), Kettler Management, Inc. ("Kettler"), JBG SMITH Management Services, LLC ("JBG Smith"), and Tower Construction Group, LLC ("Tower") (collectively,

---

[1] The court in *Opiotennione v. Facebook, Inc.* dismissed Plaintiff's claims but allowed leave to amend:

> Having concluded that Plaintiff has not alleged facts that support a finding that she suffered an injury in fact, Facebook's motion to dismiss for lack of standing must be granted. While Facebook argues that there are myriad other reasons why her claims fail, including additional standing problems, the Court declines to address them given its conclusion that Plaintiff has not even made it past the first step. The motions for leave to file amicus briefs are denied as moot since they relate to the Rule 12(b)(6) motion to dismiss.
>
> Plaintiff's amended complaint, if any, is due within 30 days of this order.

2020 WL 5877667, at *5. Plaintiff did not take the opportunity to amend and instead filed a notice of voluntary dismissal on November 2, 2020. *Opiotennione v. Facebook, Inc.*, No. 3:19-cv-07185-JSC (N.D. Cal.), ECF No. 72.

"Defendants") discriminated against her and others by using age, among other criteria, to target a handful of facially nondiscriminatory advertisements on Facebook to a younger audience.  Because the federal Fair Housing Act ("FHA"), 42 U.S.C. § 3604, *et seq.*, and corollary state statutes do not treat age as a protected class, Plaintiff asserts claims under the Montgomery County Code ("MCC"), the D.C. Human Rights Act ("DCHRA"), and the D.C. Consumer Protection and Procedures Act ("DCCPPA").

## I.     Plaintiff's Allegations

When she filed the Amended Complaint, Plaintiff was a 55-year-old resident of Washington D.C. who claimed to have looked for housing opportunities in the District of Columbia, Northern Virginia, and Montgomery County, Maryland throughout 2018 and early 2019. JA14 (¶ 6).  She alleges that she specifically looked for a two- or three-bedroom unit with a maximum monthly rent of $2,500.00.  *Id.* She does not allege that she did anything herself to find information about housing opportunities; she merely reviewed advertisements that she passively received on her Facebook News Feed.  *Id.*  At some point in 2019, she abandoned her search for a rental property and bought a home in the District of Columbia, where she had lived for the previous 25 years.  *Id.*

Plaintiff alleges that she was interested in receiving advertisements about properties through Facebook and on appeal adds an embellishment that she visited

various properties in both jurisdictions—none of which are anywhere identified. JA14-15 (¶ 7).[2] She claims that Defendants, separately and independently from one another, published advertisements regarding properties in the District of Columbia or Montgomery County targeted towards younger Facebook audiences. *Id.* Plaintiff contends that those advertisements did not pop-up on her Facebook News Feed because she did not fall within the target audience due to her age. *Id.* She asserts that, had she received those Facebook advertisements, she "would have clicked on the ads, she would have reviewed the information on all of the defendants' web sites to learn about their housing opportunities in the D.C. metropolitan area, and she would have applied for and secured a two-bedroom apartment at one or more of the properties of Bozzuto, JBG Smith, Kettler, and Tower for which she was qualified." *Id.*

Plaintiff identified 28 separate properties individually owned, operated, and/or managed by the named defendants in the Amended Complaint and contends in her opening brief—without any articulated basis for doing so—that Defendants "collectively lease hundreds of thousands of apartments nationwide." Opening Br. 6; JA27-31. But this suit concerns only six specific properties where she allegedly would have considered renting a unit and six advertisements for them. JA27-31

---

[2] The Amended Complaint—unlike her Opening Brief—does not mention that she visited apartments. The Court should not credit Plaintiff's effort to add new factual allegations that were not before the District Court.

(¶¶ 52, 54, 56, 58); JA41-42 (¶ 90); Opening Br. 5.  The six specific properties are two Bozzuto properties in D.C. and Silver Spring, Maryland, two JBG Smith-affiliated properties in D.C., one Kettler property in Bethesda, Maryland, and one Tower property in Silver Spring.  *Id.*[3]

Plaintiff contends that Defendants' targeted Facebook advertisements demonstrate that each engaged in a pattern or practice of "digital discrimination" that "steered" her and others away from their properties.  JA12.  The Amended Complaint identifies specific advertisements that allegedly violate the MCC, DCHRA, and DCCPPA by targeting an age-limited demographic through Facebook. JA23-24 (¶ 44); JA32-36 (¶¶ 63-71); JA70-72; JA75-78; JA80; Opening Br. 7-10.

Plaintiff does not and cannot allege that any of Defendants' advertisements were facially discriminatory.  Each advertisement merely identified a property and provided some general marketing language touting the property's units and amenities.  The advertisements do not contain any text or images that would suggest a preference for tenants of any particular age demographic.  She instead contends that publishing any housing advertisement targeted toward younger Facebook users violates the MCC, DCHRA, and DCCPPA, even if the advertiser also publishes

---

[3] Plaintiff does not claim that she would have considered renting at any JBG Smith property in Montgomery County or at any Kettler property in D.C.  As regards Tower, she does not allege that it had any residential rental properties in D.C.  The only Tower properties identified in the Amended Complaint are in Montgomery County.

advertisements elsewhere for the same housing directed to the general public without regard to age.  JA11.

Critically, Plaintiff admits that, although advertisers had the ability to select its preferred target audience for specific ads, they do not ultimately decide which Facebook users see their advertisements.  Rather, as she recognizes, Facebook alone "uses an algorithm and machine learning to determine which persons within a particular audience selection will receive a particular advertisement."  JA21 (¶ 35). In fact, in her lawsuit against Facebook, Plaintiff argued that "Facebook is solely responsible for developing its ad delivery algorithm and the resulting denial of ads to . . . older people."  *Opiotennione v. Facebook, Inc.*, No. 3:19-cv-07185-JSC (N.D. Cal.), ECF No. 39 at 27.

Plaintiff nonetheless alleges that Defendants discriminated against her and others through their "reliance on Facebook's ad-delivery algorithm . . . which determines which Facebook users will receive the ads" based on several factors, including age, and that Defendants "ma[de] matters worse[] [by] expressly t[elling] recipients that they wanted to reach only younger people."  JA10-11.  The "t[elling] recipients" allegation refers to Facebook's "Why am I seeing this ad?" disclosure and not any statement written or approved by the Defendants.  By clicking on three dots that Facebook places in the upper-righthand corner of every advertisement on its platform, a Facebook user can see a summary of some of the criteria that informed

Facebook's decision to display a particular ad, such as age, location, interests such as pets or restaurants, and previous activity on Facebook. *See* JA32-36. In her class action suit against Facebook, Plaintiff recognized that "Facebook wholly creates these statements, as it exercises total control over whether to make the statement and on the relevant content and images in the statement." *Opiotennione v. Facebook, Inc.*, No. 3:19-cv-07185-JSC (N.D. Cal.), ECF No. 39 at 29. She offers no new facts in this case to undercut her prior recognition of Facebook's control.

## II.    Procedural History

Plaintiff and Housing Rights Initiative ("HRI"), a self-described non-profit organization dedicated to promoting lawful real estate practices, initiated this lawsuit on July 1, 2020. D. Ct. Dkt. 1. The four Defendants (along with five co-defendants who have since been voluntarily dismissed from the lawsuit) moved to dismiss on October 8, 2020, arguing that the District Court should dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1) because Plaintiff and HRI both lacked standing and under Rule 12(b)(6) for failure to state a claim under the MCC, DCHRA, and DCCPPA. D. Ct. Dkt. 47.

Rather than respond to the motion, Plaintiff and HRI filed an Amended Complaint on November 23, 2020. JA9-84. Because the Amended Complaint did not cure the original complaint's deficiencies, Defendants moved to dismiss under Rules 12(b)(1) and 12(b)(6) on January 7, 2021. D. Ct. Dkt. 65. On February 26,

2021, Plaintiff filed an opposition.  D. Ct. Dkt. 69.  That same day, HRI voluntarily dismissed its claims.  D. Ct. Dkt. 68.

On July 20, 2021, following oral argument, the District Court granted the motion to dismiss the Amended Complaint for lack of standing pursuant to Rule 12(b)(1).  JA94-104.  Plaintiff had failed to demonstrate that any of her alleged injuries was sufficient to confer constitutional standing.  *Id.*

The District Court took each alleged injury in turn.  It started with Plaintiff's argument that she suffered an injury because Defendants allegedly deprived her of information about housing opportunities by excluding her from targeted audiences of a handful of Facebook advertisements.  JA98-100.  The District Court noted that Plaintiff did not seek out information from Defendants or receive false information from them.  JA99.  Her accusation, instead, was that Defendants had not caused Facebook to show her specific advertisements for properties in which she says she would have been interested.  JA99-100.  The District Court determined that Defendants did not deprive Plaintiff of information by allegedly failing to handfeed her that specific information when that same information was readily available to Plaintiff and other members of the public through simple Google searches or through other online resources.  *Id.*

Second, the District Court rejected Plaintiff's theory that Defendants caused her to incur greater expense and suffer some undefined delay and hardship in her

housing search. JA100-01. Specifically, Plaintiff alleged that Facebook's failure to deliver certain advertisements to her News Feed prevented her from pursuing housing opportunities. The District Court found that Plaintiff's alleged economic harm was "highly conjectural," noting that the advertisements at issue did nothing more than provide links to other websites that Plaintiff could readily have found on her own. *Id.* According to the allegations in the Amended Complaint, Plaintiff did not take even a single affirmative step to locate rental housing. Instead, she filed suit when she says that she learned that a handful of advertisements on Facebook were not delivered to her News Feed. In short, she complained that she was harmed because, although she hoped to see ads for housing on her Facebook News Feed, she had not seen the six advertisements from Defendants identified in the Amended Complaint. *See* JA32-36, JA40-41.

The District Court next rejected Plaintiff's argument that she had suffered stigmatic harm upon learning that she was not in the audience targeted to receive a handful of facially neutral advertisements. JA101-02. Plaintiff failed to allege any facts regarding how she became aware that she had been excluded from receiving those advertisements and failed to allege that any Facebook users even knew that she had been excluded from the group. *Id.* The District Court found that Plaintiff had failed to plead a stigmatic injury because she could not demonstrate that the

people who received the facially nondiscriminatory advertisements knew that they had been targeted or that Plaintiff had been excluded.  JA102.

Finally, the District Court rejected Plaintiff's unfounded claim that she had been denied the benefits of living in age-integrated housing because Facebook had steered her away from certain housing opportunities.  JA102-03.  The court again reasoned that Defendants had not steered Plaintiff away from their properties merely by not including her in the targeted audience for every advertisement that they published.  JA103.  Those ads simply led to the same websites that she could have found through any number of methods had she conducted even a simple search through readily available online resources.  *Id.*

Plaintiff filed a notice of appeal on August 18, 2021.  JA105.  She initially appealed the District Court's dismissal of her claims against all nine defendants named in the Amended Complaint.  *See id.*   On December 9, 2021, Plaintiff voluntarily dismissed her claims against Greystar Management Services, LP, Wood Residential Services, LLC, Pinnacle Campus Living, LLC, Vantage Management, Inc., and Berkshire Communities, LLC.  Dkts. 41, 43.  As a result, Plaintiff now appeals only the District Court's dismissal of her claims against the four Defendants: Bozzuto, Kettler, Tower, and JBG Smith.

## SUMMARY OF ARGUMENT

The District Court was right to conclude that Plaintiff failed to allege an

12

invasion of a legally protected interest that is concrete, particularized, and not conjectural or hypothetical. She therefore failed to allege an injury in fact and lacks standing to pursue her claims.

Plaintiff asserted four purported injuries in fact below, and the District Court correctly rejected each one.

*First*, Plaintiff's asserted informational injury fails because she identified no information that she was prevented from receiving, and information about all the properties at issue was widely available to her through many online sources. Unlike plaintiffs who have been found to suffer informational injuries, Plaintiff does not allege that she sought information from Defendants and received a false or misleading response. She instead alleges that she had a lower likelihood of receiving information that she desired. But she points to no cases finding standing on such grounds. Nor could she, because even had she been in the alleged targeted age range for Defendants' Facebook advertisements, Facebook ultimately decides which users will see an advertisement based on a proprietary algorithm that relies on many factors outside of the advertiser's proposed criteria. It is thus entirely speculative that she would have received the desired information in the absence of the challenged conduct.

*Second*, Plaintiff's allegations of economic harm are similarly deficient. As the District Court explained, her claims are highly conjectural given the many

alternative ways she could have learned about Defendants' properties. And her Amended Complaint offers nothing other than conclusory allegations to suggest that she incurred more expense or inconvenience or was steered to less desirable or more expensive housing because she did not see Defendants' Facebook advertisements in her News Feed.

*Third*, Plaintiff's allegations of stigmatic injury are insufficient because, under Supreme Court precedent, a plaintiff must personally experience the alleged discriminatory behavior to allege the type of concrete, particularized injury that would provide standing. This principle dooms Plaintiff's argument because she cannot show she was personally stigmatized by advertisements she never received; her alleged injury is therefore abstract and generalized. Her Amended Complaint contains no factual detail about how she came to discover these advertisements or learned about the audiences to which they were targeted. In any case, the challenged conduct—alleged targeting of facially nondiscriminatory advertisements—is nowhere close to sort of denigrating behavior that has supported stigmatic injury in other cases.

*Fourth*, on appeal, Plaintiff does not take issue with the District Court's correct conclusion that she failed to adequately allege a lost opportunity to live in an age-diverse community.

Perhaps because the District Court's reasoning was sound, Plaintiff tries a new theory of standing in this Court:  that allegations of discriminatory treatment *ipso facto* satisfy Article III's injury-in-fact requirement.  But because Plaintiff did not raise this argument below, it should not be considered.

In any case, this new theory is meritless.  Allegations of discrimination cannot satisfy Article III's standing requirements unless they also allege some concrete injury caused by the discrimination that could be redressed by a favorable judgment.  If Plaintiff's argument were correct, no lawsuit alleging discrimination would ever be dismissed for lack of standing; but courts often dismiss discrimination lawsuits for lack of standing.  The same result is warranted here for Plaintiff's novel theory of age discrimination through targeted advertising.  Even if facially neutral advertisements could be discriminatory because of the audiences to whom they are aimed, Plaintiff's objection to the content of ads she never saw is a generalized grievance, not discriminatory treatment of her personally.  Much like her unsuccessful allegations of stigmatic injury, her primary theory on appeal lacks the requisite particularity.  And even if mere allegations of discriminatory behavior could confer standing, Plaintiff fails to allege well-pleaded facts that could plausibly show that Defendants' challenged advertising conveyed a discriminatory message, a requirement under Montgomery County or District of Columbia law.  Plaintiff cannot support standing based on discrimination that she failed to adequately plead.

Finally, Plaintiff's policy arguments are completely baseless. The District Court's ruling does not give a green light to discrimination. It simply applies well-settled standing principles to Plaintiff's strained and unsupported allegations.

## STANDARD OF REVIEW

This Court reviews the District Court's Rule 12(b)(1) ruling *de novo*. *24th Senatorial Dist. Republican Comm. v. Alcorn*, 820 F.3d 624, 628 (4th Cir. 2016). A plaintiff bears the burden of "clearly . . . alleg[ing] facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *Warth v. Seldin*, 422 U.S. 490, 518 (1975).

When assessing the Amended Complaint, this Court, like the District Court, assumes as true all well-pleaded facts and draws reasonable inferences in favor of the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). But the Court need not accept as true unwarranted inferences, unreasonable conclusions, or arguments. *Id.*

Contrary to Plaintiff's argument, when resolving a motion under Rule 12(b)(1), the Court is not required to accept blindly the plaintiff's allegations. Instead, the Court "is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings[.]" *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999) (citation and internal quotation marks omitted).

**ARGUMENT**

The District Court correctly found that Plaintiff lacked standing to sue because she had not plausibly alleged that she personally suffered an injury in fact based on not receiving certain Facebook advertisements for Defendants' properties. Further, even if she had argued below that her allegations of discrimination were sufficient on their own to confer standing, the District Court would still have been correct to dismiss her Amended Complaint. A bare allegation of a discriminatory practice, absent some concrete injury, is not enough to confer standing to sue under Article III. And, in any event, Plaintiff has failed to plausibly allege discrimination under Montgomery County or D.C. law. The Court should affirm the District Court's dismissal of the Amended Complaint.

## I.  Legal Standard to Prove Article III Standing

To establish standing, a plaintiff must demonstrate an injury in fact—"an invasion of a legally protected interest" that is (1) "concrete," (2) "particularized," and (3) "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "For an injury to be 'particularized,' it must affect the plaintiff in a personal and individual way" and be "real," not "abstract." *Id.* Generalized grievances that are "shared in substantially equal measure by all or a large class of citizens" do not

17

suffice. *Warth*, 422 U.S. at 499; *see also Lujan*, 504 U.S. at 575; *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009).

A plaintiff must also establish that any injury in fact is fairly traceable to the challenged conduct and that the injury would "likely [] be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338. "[A] plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

## II.    The District Court Properly Found Plaintiff Failed to Allege Article III Standing.

The District Court correctly concluded that Plaintiff lacked standing after a thorough assessment of the four purported injuries she alleged below and her asserted causes of action. These claimed injuries are too generalized, speculative, and untethered to Defendants' alleged conduct to satisfy Article III. Plaintiff's arguments are no more persuasive this time around.

### A.    Plaintiff Did Not Plausibly Allege an Informational Injury Because She Was Not Denied Access to Any Information About Housing Opportunities.

The District Court correctly found that Plaintiff's allegations of informational injury were insufficient. JA98-99. Below, Plaintiff asserted that Defendants "deprived" her of "crucial information" about housing opportunities at their properties, placing heavy emphasis on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). *See* D. Ct. Dkt. 69, at 5. But the District Court explained that the

18

Amended Complaint's allegations do not support Plaintiff's asserted inability to obtain information about these housing opportunities.

To start, Plaintiff "fail[ed] to state what specific information she was prevented from receiving, such as the availability of or rental price of units in a particular building." JA99. Even a cursory review of the advertisements at issue shows that they do not themselves reveal crucial or unique information, but instead contain "little more than conventional marketing language" and a link to the property's website. *Id.*; *see* JA70-84.

The District Court correctly noted that the same information was located on many other websites that Plaintiff could have easily located through "a simple Google search." JA100. The Court may properly take judicial notice of the fact that a simple Internet search leads to dozens of websites that contain advertisements for the very properties she claims would have interested her, including Apartments.com, ApartmentFinder.com, ApartmentRatings.com, ApartmentGuide.com, BuzzBuzzHome.com, RentCafe.com, and Zillow.com. JA87; Fed. R. Evid. 201(b), (d).[4] Facebook was only one of many portals through which Defendants advertised these properties.

---

[4] The apartment buildings that Plaintiff alleges she was qualified for and interested in learning more about (JA41-42 (¶ 90); *see also* Opening Br. 8-10) all have individual websites and their own listings on multiple apartment search websites

As amicus AARP argued below, the way renters look for apartments is to actively search on the internet.   JA89.  Yet the Amended Complaint describes no Internet searches by Plaintiff, even though such a search would have readily yielded detailed information about Defendants' apartments.   Indeed, the Amended Complaint does not even describe what steps Plaintiff took to find information about housing opportunities *on Facebook*, much less on any apartment search websites or through a simple Google search for "apartments available near Washington, D.C."

---

that include detailed information about units, rates, amenities, and policies, and contact information for prospective tenants:

> (1) The Banks (a Bozzuto property): https://www.banksdc.com/; https://www.apartments.com/the-banks-washington-dc/88s0eb3/
> (2) Central (a Bozzuto property): https://www.bozzuto.com/apartments/silver-spring/md/central/; https://www.apartments.com/central-silver-spring-md/3n8c7pd/
> (3) 1221 VAN (a JBG Smith property): https://www.1221van.com/; https://www.rentcafe.com/apartments/dc/washington/1221-van/default.aspx
> (4) Atlantic Plumbing (a JBG Smith property): https://www.atlanticplumbingdc.com/; https://www.apartments.com/atlantic-plumbing-washington-dc/x7etc0p/
> (5) The Pearl (a Tower property): https://www.liveatthepearl.com/; https://www.apartments.com/the-pearl-silver-spring-md/4hr23sl/
> (6) Solaire (a Kettler Property): https://www.solaire7077.com/; https://www.apartments.com/solaire-7077-woodmont-bethesda-md/bxkm9pc/

These websites and dozens of other similar websites catering to individuals looking to rent an apartment are some of the first results members of the general public see when they conduct a basic Google search for "apartments near Washington, D.C." or "apartments in Silver Spring, Maryland."

As far as one can tell from the allegations in the Amended Complaint, Plaintiff only passively waited for housing advertisements to appear on her Facebook News Feed.

Plaintiff cannot plausibly allege an "[i]nability to obtain information" when her Complaint does not allege that she took even the most basic steps to look for information about housing opportunities and when she makes no plausible allegation that, despite reasonable efforts to find this information, she could not obtain it. *Griffin v. Dep't of Lab. Fed. Credit Union*, 912 F.3d 649, 654 (4th Cir. 2019) (finding a lack of standing where plaintiff failed to obtain information that was not sufficiently relevant to him).

On appeal, Plaintiff backs away from her claim of information deprivation. She instead argues that she was entitled to "equal access" to the information but was at a "comparative disadvantage" in obtaining it relative to others. Opening Br. 30, 35. This newly constructed argument fares no better.

Plaintiff cites no authority suggesting that equal access to information is itself a "legally protected interest" for purposes of standing. *Spokeo*, 578 U.S. at 339. She again invokes *Havens Realty* but ignores the District Court's explanation of why *Havens Realty* does not support standing in this case. *See* JA99. *Havens Realty* centered on two "testers" who inquired about the availability of apartments but did not intend to rent: a black tester was falsely told that no apartments were available, while a white tester was told the opposite. 455 U.S. at 368. The Supreme Court

21

found that the black tester had standing to sue because that misrepresentation violated her statutory right to truthful information. *Id.* at 374. But the white tester lacked standing because the information he received was truthful. *Id.* at 374-75.

The District Court correctly recognized that *Havens Realty* is not on point. That ruling is consistent with other recent decisions that have rejected efforts to analogize "tester" cases like *Havens Realty* to allegations of discriminatory Facebook advertising like the ones Plaintiff makes here. *See, e.g.*, *Vargas v. Facebook, Inc*., No. 19-CV-05081-WHO, 2021 WL 3709083, at *3 nn.7-8 (N.D. Cal. Aug. 20, 2021), *appeal filed*, No. 21-16499 (9th Cir. Sept. 10, 2021) (finding *Havens Realty* distinguishable from case where plaintiff alleged discrimination based on not receiving certain Facebook advertisements); *Bradley v. T-Mobile US, Inc.*, No. 17-CV-07232-BLF, 2020 WL 1233924, at *8 (N.D. Cal. Mar. 13, 2020) (same). Plaintiff does not allege that she made inquiries about any Defendant's properties, let alone that Defendants misrepresented the availability of any housing. JA99. Indeed, other than saying that she looked at her Facebook feed from time to time, without any specifics as to when, how often, or what she did on Facebook to find information about apartments, she makes no factual allegation at all about her "search" for an apartment.

Moreover, in contrast to someone who requested information and was told a falsehood, here it is entirely speculative whether Plaintiff would have received more

information about Defendants' properties in the absence of the alleged targeting of Defendants' ads. The Amended Complaint identifies only *six* properties that allegedly interested her. JA27-31, JA42. Plaintiff alleges "[o]n information and belief" that she "would [have] had a far greater chance of receiving" some of the ads for these properties. JA31-32. But an informational injury—like any injury in fact—must be "actual," not "conjectural" or "hypothetical." *Lujan*, 504 U.S. at 560. Plaintiff does not allege that she satisfied the other targeting criteria for Defendants' Facebook advertisements. And even if she had, whether she would have ultimately received any of Defendants' Facebook ads turns on the factors outside Defendants' control, such as the criteria that Facebook uses for showing ads, the way its advertising algorithms work, and Plaintiff's own activities on Facebook. *See* JA20-21 (¶¶ 34-36).

Because Facebook's algorithm determines whether Plaintiff would have received Defendants' ads, Plaintiff's claim that she would have had a "far greater chance" of receiving Defendants' ads had the advertisers not expressed a demographic preference is pure speculation. Without any allegations as to whether Plaintiff met the other criteria that Facebook describes as the basis for receiving Defendants' ads or whether she took other actions on Facebook or elsewhere online that inform Facebook's algorithm, there is no way to know what, if any, chance Plaintiff would have had to receive these ads. Plaintiff cannot rest her theory of

23

informational injury on "speculation about the unfettered choices made by independent actors not before the court." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (citation and quotation marks omitted).

In sum, Plaintiff chose not to look at readily available and easily searched online apartment listings and instead alleges that she was waiting for Facebook to populate her News Feed with advertisements for apartments. Based on these insufficient allegations, the District Court correctly concluded that, even if having comparatively less access to certain advertisements could confer standing, Defendants' advertising practices did not put Plaintiff at any comparative disadvantage. Ample information about Defendants' properties was available to anyone who cared to look.

## B. Plaintiff Did Not Plausibly Allege Any Economic Injury.

Closely related to Plaintiff's argument about informational injury is her allegation that Defendants' alleged actions caused her economic injury by depriving her of housing opportunities or making it more costly for her to obtain housing. Opening Br. 30-32, 35-37. This claimed injury is equally generalized, speculative, and implausible based on the facts alleged in the Amended Complaint.

As the District Court explained, this alleged harm is "highly conjectural" for the same basic reasons as the alleged informational harm: she "could just as easily have reached" Defendants' websites and the desired housing opportunities in many

24

other ways.  JA100-01.  Plaintiff failed to allege that pursuing these alternative avenues would have forced her to incur "more expense" or "more inconvenience" than "scroll[ing] through Facebook in the hope of lighting upon just the right housing advertisement, which may in fact never appear."  JA101.

Plaintiff now contends that her claims are akin to the plaintiff in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264 (1977)—a case that her briefing below never cited.  D. Ct. Dkt. 69.  But in that case, unlike this one, the defendant's challenged conduct truly prevented the plaintiff from occupying a specific property.  A developer had agreed to purchase a parcel on which it planned to build a multi-family housing development but could not move forward under existing zoning restrictions.  429 U.S. at 264.  The plaintiff desired to live in the planned development and claimed that the municipal defendant's refusal to rezone the parcel violated federal law.  *Id.*  The challenged refusal to rezone the parcel stood "as an absolute barrier to constructing the housing," *id.* at 261, and in turn, as an absolute barrier to the individual plaintiff's living in that housing, *id.* at 264.  Here, on the other hand, nothing prevented Plaintiff from learning about and applying to rent an apartment in any of the six buildings.  *See* JA87; JA99-100.

As with her claims of informational injury, Plaintiff quickly pivots from a theory that Defendants deprived her of opportunities to a theory that Defendants made it harder for her to pursue those opportunities, at least relative to younger

Facebook users. Opening Br. 35. But as the District Court recognized, the Amended Complaint is devoid of any factual allegations describing actions Plaintiff took in her search for housing or how Defendants' ad-targeting caused her to incur "more expense" or "more inconvenience" in that search. Without any information on steps that she took or how she was actually inconvenienced or delayed in her search, there are no factual allegations from which to infer that she suffered any concrete economic injury. Her argument for economic injury, like her argument for informational injury, is entirely speculative. *See supra* Section II.A; JA101.

Plaintiff faults the District Court for considering readily available alternative paths to housing opportunities. Opening Br. 35-36. But it is well established that the district court was not limited to the allegations on the face of the Amended Complaint. It is also proper to consider "matters of public record," *Episcopal Church in S.C. v. Church Ins. Co. of Vt.*, 997 F.3d 149, 155 (4th Cir. 2021), including information on publicly available websites, *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004). In evaluating a plaintiff's standing at the Rule 12(b)(1) stage, a district court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Episcopal Church in S.C.*, 997 F.3d at 155 n.6 (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)). The District Court's consideration of what any

member of the general public would uncover with a basic Google search was completely proper. *See* Fed. R. Evid. 201(b).

Plaintiff nonetheless claims that this was improper fact-finding at the motion to dismiss stage. Opening Br. 35-36. But the sole case she cites on this score does not support her argument. On the contrary, in *Wikimedia Foundation v. National Security Agency*, 857 F.3d 193, 208 (4th Cir. 2017), this Court reiterated that it is appropriate to consider only "well-pleaded facts" and to set aside "legal conclusions pleaded as factual allegations, 'unwarranted inferences,' 'unreasonable conclusions,' and 'naked assertions devoid of further factual enhancement.'" (citation omitted). Applying that approach, the Court carefully scrutinized the complaint's allegations and found that one plaintiff had adequately alleged standing while the others had not. *Id.* at 209-16. It underscored that courts must not "dilute the plausibility pleading standard to a near-nullity." *Id.* at 216. And the plausibility standard "requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). That is just what the District Court did here in considering the widespread availability of information about Defendants' properties. Had she taken any steps to actively look for an apartment, Plaintiff would have had easy access to the opportunities she claims to have been denied.

Plaintiff attempts to sidestep this problem by asserting that lost time is itself an injury. Opening Br. 36-37. That principle is not in dispute. What is in dispute is whether Plaintiff has adequately alleged that the challenged conduct forced her to spend additional time or effort in her search for housing. She makes a conclusory allegation that the challenged conduct "contributed to [her] hardship and increased the time it took for her to secure housing," JA42, but there are no well-pleaded facts to support this bare assertion. At most, she points to allegations that many advertisers find Facebook ads (especially targeted ones) to be a worthwhile investment overall. Opening Br. 35-36. But these generalities do not help to show that eliminating the alleged targeting here would have helped *Plaintiff* in her personal search for housing. As the District Court noted, it takes time and effort to scroll through Facebook as well, and it requires conjecture and speculation to assume that a desirable opportunity would have presented itself in the absence of the challenged activity. JA101.

Because Plaintiff does not allege any facts that would demonstrate that she wasted time (or money) because of Defendants' actions or would have saved time (or money) had Defendants acted differently, the cases on which Plaintiff relies for this argument are inapposite. *See* Opening Br. 36-37. They involve plaintiffs who did spend additional time or effort as a result of the defendants' allegedly unlawful conduct. *See Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685, 693 (8th Cir. 2017)

(plaintiff retained counsel and defended against a meritless lawsuit); *Dieffenbach v. Barnes & Noble, Inc.*, 887 F.3d 826, 827-28 (7th Cir. 2018) (plaintiffs spent money on credit-monitoring and spent time establishing new accounts after credit card data theft); *Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, 942 F.3d 1200, 1207 (11th Cir. 2019) (plaintiff spent time and money trying to correct a false credit report); *Craftwood II, Inc. v. Generac Power Sys., Inc.*, 920 F.3d 479, 481 (7th Cir. 2019) (plaintiffs' employees spent time reading unlawfully sent faxes).

Any search for housing requires time and effort, and Plaintiff failed to plausibly allege that Defendants' allegedly unlawful advertising practices forced her to spend additional time or effort beyond what she otherwise would have spent. What she has alleged, in essence, is that she did not discover opportunities that she could have readily discovered through widely available alternative sources and that she might never have discovered through untargeted Facebook advertising. Such allegations do not give rise to injury in fact.

### C. Plaintiff Did Not Plausibly Allege Stigmatic Injury.

The District Court also correctly determined that Plaintiff failed to plead sufficient facts to support a plausible claim of stigmatic harm.[5] JA101-02. The

---

[5] The amicus briefs filed by the AARP and the ACLU Foundation et al. argue at great length that allegations of stigmatic harm can confer standing. But the District Court did not hold that stigmatic harm as a category cannot be a basis for standing. Rather, it held that Plaintiff had failed to sufficiently allege stigmatic harm that

Supreme Court has recognized that a "stigmatizing injury," such as the injury "often caused by racial discrimination," can be sufficient to show standing in some circumstances. *Allen v. Wright*, 468 U.S. 737, 755 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). But "abstract stigmatic injury" from alleged discriminatory behavior is not sufficient. *Id.* at 755-56. Instead, stigmatic injury "accords a basis for standing only to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct." *Id.* at 755 (citation omitted). As this Court recently explained, a stigmatic injury must have sufficient "'personal' impact" on the plaintiff or else it is "too 'abstract'" to support standing to sue. *Griffin*, 912 F.3d at 654 (quoting *Allen*, 468 U.S. at 756-57). In this way, contemporaneous first-person experience is necessary to allege stigmatic harm plausibly.

As the District Court noted, Plaintiff fails to allege any first-person experience of discrimination. JA101-02. Unlike the plaintiffs in *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 904 (2d Cir. 1993), she does not allege that she was "confronted by advertisements indicating a [discriminatory] preference." On the contrary, the crux of her whole lawsuit is that she did *not* receive the challenged advertisements. She alleges that she learned, only after the fact, that certain ads

---

was concrete and particularized. The amicus briefs filed in support of Plaintiff's appeal say nothing about how she in particular suffered stigmatic or any other harm traceable to Defendants' conduct.

appeared in the Facebook News Feed of other Facebook users who received those ads based on a mix of characteristics such as age, specific interests, or recent visits to Silver Spring, Maryland or Washington, D.C. The Amended Complaint does not allege when or how she became aware of or reviewed the advertisements and associated Facebook "Why am I seeing this ad?" statements. Further, the targeting criteria is not visible on the advertisements themselves—even a person who saw the ad would have had to click on the three dots in the corner to see the criteria that informed Facebook's decision to display the ad in their News Feed. It is therefore speculative at best to allege that a reasonable person viewing the facially neutral advertisements in question would have taken away a message that Defendants considered older individuals less desirable as tenants.

Ultimately, Plaintiff's claim is based on learning about the ad targeting but not on experiencing any discriminatory treatment herself. Anyone over 50 years of age could have learned about the alleged advertisement-targeting after the fact and taken the same offense as Plaintiff. This is why personal connection to the challenged advertisements is necessary to support standing based on stigmatic injury. Plaintiff cannot cite any authority for the radical proposition that any member of a group who learns of allegedly discriminatory activity against another member of that group has standing to sue. Such a broad standard would obliterate Article III's requirement of a personalized, concrete injury.

31

In addition, the challenged conduct here bears little resemblance to the denigrating behavior that supported stigmatic injury standing in other cases.[6] There is no allegation that the ads themselves contain offensive images or language indicating a preference for a particular age group or indicating that certain age groups are less desirable or unwelcome in the advertised apartment buildings. The only language that Plaintiff even argues indicates such a preference does not appear in the ads, but in the commentary offered by Facebook to users who saw those ads and clicked on the corner to pull up the "Why am I seeing this ad?" statement. Plaintiff does not allege that had she seen the ad, she would have clicked the link to view the Facebook commentary, nor does she allege that other Facebook users clicked on the link to see the Facebook text. That text also included statements indicating that the landlords in question were interested in reaching "people interested in Pets" or people who "live near Silver Spring, Maryland." It is thus speculative and implausible that any particular Facebook user would have viewed a facially neutral advertisement to imply that the advertiser considered older people "disfavored" or

---

[6] Plaintiff's citation of *Smith v. City of Cleveland Heights*, 760 F.2d 720, 723 (6th Cir. 1985), provides no support. There, the plaintiff's own municipality had allegedly adopted a racial steering "policy to deter other members of [the plaintiff's] race from residing in his community," and this policy "directly affect[ed] [his] interest in his own self-respect, dignity and individuality as a person in his own town." *Id.* at 722. Plaintiff obviously does not allege "an official government policy that directly discriminated on the basis of race in a discrete community" in which she lives. *Id.* at 723.

"innately inferior." *Heckler v. Mathews*, 465 U.S. 728, 739 (1984) (citation omitted).

Courts have routinely declined to confer standing for stigmatic injury based on allegations like Plaintiff's here, including allegations made by Plaintiff herself against Facebook in her earlier lawsuit challenging Facebook's advertising practices. *See, e.g.*, *Opiotennione v. Facebook, Inc.*, 2020 WL 5877667, at *5 (dismissing claims of stigmatic harm where there was no denial of equal treatment); *see also Wilson v. Glenwood Intermountain Props., Inc.*, 98 F.3d 590, 596 (10th Cir. 1996) ("mere receipt by plaintiffs of the discriminatory advertisements in this case could cause only the kind of 'abstract stigmatic injury' held insufficient to establish standing in *Allen*."). The District Court correctly found that Plaintiff had not alleged any facts that would show that she personally experienced the type of "embarrassment and humiliation" that is concrete and particularized enough to support standing. JA101 (quoting *McCrary v. Runyon*, 515 F.2d 1082, 1089 (4th Cir. 1975), *aff'd*, 427 U.S. 160 (1976)).

And once again, Plaintiff identifies no case finding standing based on comparable facts. *See* Opening Br. 32-33.[7] To the contrary, the stigmatic injury

---

[7] Plaintiff places curious amount of weight on a Fifth Circuit panel's finding of standing in *Apache Bend Apartments, Ltd. v. United States*, 964 F.2d 1556, 1560 (5th Cir. 1992), even though that holding was repudiated by the en banc Fifth Circuit, 987 F.2d 1174, 1175-76 (5th Cir. 1993) (en banc). In any event, that case did not involve age discrimination and is irrelevant.

case law in this Circuit and elsewhere stands in stark contrast to Plaintiff's thin allegations in this case. Consider *McCrary*, 515 F.2d 1082, where the plaintiffs were personally informed their children could not apply because of their race; *Carter v. Duncan-Higgins, Ltd.*, 727 F.2d 1225 (D.C. Cir. 1984), where the plaintiff was personally subjected to a racist anecdote and personal taunting by employer; and *Ragin*, 6 F.3d 898, where the plaintiffs personally read facially discriminatory advertisements over a three-year period, including dozens of ads with all white models.

### D. Plaintiff Did Not Plausibly Allege Standing Based on Living in an Age-Integrated Community.

On appeal, Plaintiff no longer attempts to base standing on allegations that she was deprived of the opportunity to live in an age-diverse community. *See* JA102-03. Thus, this brief does not address these points other than to note that the Amended Complaint again lacks specific, well-pleaded facts that would support such allegations, as the District Court determined. *Id.*

### III. Plaintiff's Allegations of Discrimination Do Not Give Rise to Standing and Do Not State A Claim.

Unable to cast doubt on the District Court's analysis of the four injuries she claimed below, Plaintiff tries a different tack on appeal. She now argues that any claim of discrimination is itself sufficient harm to confer standing. Plaintiff's new theory, raised for the first time on appeal and echoed by *amici*, is that any time a

plaintiff alleges a claim of discrimination, the plaintiff *ipso facto* has standing to sue. Opening Br. 24-25. The Court should not consider this unpreserved argument, which is meritless.

### A. Plaintiff Failed to Preserve Her Argument That Merely Alleging Discrimination Satisfies Standing Requirements.

In the District Court, Plaintiff enumerated four alleged injuries: (1) deprivation of information, (2) economic injuries, (3) stigmatic harm, and (4) deprivation of the opportunity to live in age-integrated settings. D. Ct. Dkt. 69, at 5-11; JA98-103. She never argued that she could satisfy Article III's requirements without showing any of these four injuries. Nor did she cite *Barr v. American Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335 (2020), or any of the other cases she now invokes to claim that discriminatory classifications automatically qualify as injuries in fact. *See* Opening Br. 25.

Plaintiff's failure to make such an argument below means the Court should not consider it now. The "settled rule" in this Circuit is simple: "[a]bsent exceptional circumstances," the Court "do[es] not consider issues raised for the first time on appeal." *In re Under Seal*, 749 F.3d 276, 285 (4th Cir. 2014) (citation omitted); *see also, e.g.*, *Agra, Gill & Duffus, Inc. v. Benson*, 920 F.2d 1173, 1176 (4th Cir. 1990) ("We will not accept on appeal theories that were not raised in the district court except under unusual circumstances.").

"When a party in a civil case fails to raise an argument in the lower court and instead raises it for the first time" on appeal, this Court "may reverse only if the newly raised argument establishes 'fundamental error' or a denial of fundamental justice." *In re Under Seal*, 749 F.3d at 285 (citation omitted). The "[f]undamental error" standard is even more restrictive than the "plain error" standard that applies in criminal cases. *Id.* To preserve an issue for appeal, "[a]rguments raised in a trial court must be specific." *Id.* at 287. "[T]he party must press and not merely intimate the argument during the proceedings before the district court," which was not done here. *Id.* (citation omitted).

The usual rules of issue preservation clearly apply when a party on appeal wants to raise a new theory of standing. *See, e.g.*, *Huron v. Cobert*, 809 F.3d 1274, 1280 & n.4 (D.C. Cir. 2016) (collecting cases from various circuits holding that a theory of standing must be presented to trial court to be preserved for appeal); *cf. California v. Texas*, 141 S. Ct. 2104, 2116 (2021) (refusing to consider new theory of standing that was not raised in the lower courts).

Failing to consider this new argument would not lead to a denial of fundamental justice. Plaintiff's lawyers on appeal are the same as those below, and they simply chose not to raise the argument before the District Court. *See Cole v. Wake Cty. Bd. of Educ.*, 834 F. App'x 820, 822 (4th Cir. 2021) (holding party waived

retaliation claim in employment discrimination case; no denial of fundamental justice).

Because Plaintiff did not fairly present her new argument for standing in the trial court, this Court should not consider it.

## B.    Simply Alleging Discrimination Does Not Automatically Give Plaintiff Standing.

If the Court were to reach Plaintiff's new argument, it should reject it as meritless.   Contrary to Plaintiff's suggestion that allegations of discrimination automatically establish standing, discrimination claims are often dismissed for lack of standing.  *See, e.g.*, *Mason v. Adams Cnty. Recorder*, 901 F.3d 753, 756 (6th Cir. 2018) (affirming decision dismissing FHA complaint involving discriminatory advertising for lack of standing because plaintiff's offense at discriminatory language in land records was not a particularized injury); *Greengael, LC v. Bd. of Supervisors of Culpeper Cnty., Va.*, 313 F. App'x 577, 581 (4th Cir. 2008) (affirming decision dismissing FHA claim for lack of standing because the alleged denial of an opportunity to purchase affordable housing "was too remote and speculative to constitute an injury in fact"); *Laufer v. Naranda Hotels, LLC*, No. CV SAG-20-1974, 2020 WL 7384726, at *9 (D. Md. Dec. 16, 2020) (dismissing ADA claim for lack of standing); *Burrell v. Chi. Hous. Auth.*, No. 03 C 8776, 2005 WL 2007155, at *1 (N.D. Ill. Aug. 22, 2005) (dismissing FHA claim alleging racial discrimination for lack of standing); *Vargas*, 2021 WL 3709083, at *3 (dismissing discriminatory

advertising claims for lack of standing); *Opiotennione v. Facebook, Inc.*, 2020 WL 5877667, at *1 (same); *Bradley*, 2020 WL 1233924 (same). It is no surprise that courts do not recognize standing to sue every time discrimination is alleged: such a standard would open the floodgates based solely on conclusory allegations.

Instead of a mere allegation of discrimination being enough, the case law makes clear that courts must assess the particulars of the claim at issue and the specific allegations in the complaint and determine whether a plaintiff has suffered injury in fact. *See, e.g.*, *Warth*, 422 U.S. at 500 (explaining that standing "often turns on the nature and source of the claim asserted"); *Allen*, 468 U.S. at 752 ("the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted."); *In re Navy Chaplaincy*, 534 F.3d 756, 764-65 (D.C. Cir. 2008) (finding no injury in fact based on plaintiffs' "abstract offense" at the message conveyed by government's alleged action).

Plaintiff's conclusory allegations of discrimination are inadequate for the same reasons as her conclusory allegations of stigmatic injury. *See supra* Section II.C. Although she claims that age-based targeting of nondiscriminatory ads conveys a discriminatory message, she cannot explain how that message constituted particularized discrimination against *her*. Her offense at the supposed message of

the advertisements is, at most, an abstract and "'generalized grievance' shared in substantially equal measure by . . . a large class of citizens." *Warth*, 422 U.S. at 499.

As authority for her new argument, Plaintiff relies almost entirely on cases analyzing violations of the U.S. Constitution, none of which are applicable here. *See Barr*, 140 S. Ct. at 2354 (plurality op.) (discussing standing to raise equal-treatment constitutional violations); *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (addressing "injury in fact" in an equal protection case); *Mathews*, 465 U.S. at 730-31 (1984) (addressing standing to bring constitutional due process and equal protection claims); *Allen*, 468 U.S. at 756 (equal protection claim); *Hassan v. City of N.Y.*, 804 F.3d 277 (3d Cir. 2015) (Section 1983 claim alleging violation of rights under Free Exercise and Establishment Clauses and Equal Protection Clause as result of police surveillance program); *Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786 (4th Cir. 2004) (First Amendment claim); *MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy*, 861 F.3d 40 (2d Cir. 2017) (equal protection claim); *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630 (5th Cir. 2012) (First Amendment claim).

There is not and cannot be a constitutional claim here because the case does not involve government action. *See Wasatch Equal. v. Alta Ski Lifts Co.*, 55 F. Supp. 3d 1351, 1356 (D. Utah 2014), *aff'd*, 820 F.3d 381 (10th Cir. 2016) (equal protection clause of the Fourteenth Amendment is "only applicable to actions by the

Government and does not reach the conduct of private parties"); *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000) ("age is not a suspect classification under the Equal Protection Clause").[8]

Plaintiff's reliance on federal discrimination cases involving constitutionally protected rights is therefore misplaced. Plaintiff cannot merely accuse Defendants of discrimination and sidestep the minimum requirements of Article III standing. As discussed next, Plaintiff also cannot show that the alleged violations of Montgomery County or D.C. law give rise to a judicially cognizable injury in fact, which poses a further insurmountable problem for Plaintiff's new argument.

## C.     Plaintiff Has Failed to Put Forward Cognizable Discrimination Claims, Which Further Precludes a Finding of Standing.

Even if mere allegations of discrimination were sufficient to confer standing under Article III, Plaintiff's allegations in her Amended Complaint fail to plead discrimination in violation of Montgomery County or D.C. law. Without a well-

---

[8] Standing to challenge a government action under the Equal Protection clause is assessed differently than under the FHA and similar statutes (like Title VII). *See Wilcox v. Lyons*, 970 F.3d 452, 463 (4th Cir. 2020) (noting that "'[e]ven where particular activities and particular defendants are subject to both Title IX and the Equal Protection Clause' the pertinent standards provided by each 'may not be wholly congruent'" (citation omitted)); *Moore v. Bryant*, 853 F.3d 245, 252 (5th Cir. 2017) (declining to apply Title VII framework to equal protection claim); *Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg, N.Y.*, 111 F. Supp. 3d 459, 486-89 (S.D.N.Y. 2015) (finding standing for plaintiff Rosenbaum under Equal Protection Clause but not under FHA).

pleaded underlying claim of discrimination, there can be no injury that would support Article III, even under Plaintiff's new discrimination-alone theory.[9]

This Court can also affirm the district court's dismissal below under Federal Rule of Civil Procedure 12(b)(6) for Plaintiff's failure to state claim. *See Charbonnages de France v. Smith*, 597 F.2d 406, 416 (4th Cir. 1979) ("We are not bound on review to consider only those specific grounds upon which the district court based its grant of summary judgment, but could affirm if we perceived alternative grounds.").

### 1.    The Amended Complaint Fails to Plausibly Allege Discrimination Under the Montgomery County Code.

Plaintiff has not alleged facts needed to support a claim of a violation of the MCC, and therefore has suffered no injury traceable to Defendants' conduct.

### a.    The Amended Complaint Does Not Allege That the Advertisements Are Discriminatory.

The MCC provision at issue prohibits publishing any housing advertisement, "indicating that age could influence or affect" the rental, lease, or sale of housing or

---

[9] Plaintiff relies heavily on court filings from federal regulators, but they provide no support for her claims.  Under the FHA, aged-based advertising is not discrimination because age is not a suspect classification.  *See* 42 U.S.C. § 3604(c) (prohibiting publication of a housing advertisement "that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin").  Indeed, the FHA affirmatively authorizes housing targeted to persons 55 years of age and older and publishing information about such housing.  *Id.* § 3607(b)(2)(C).

the availability of housing.  MCC § 27-12(d).  Courts evaluate whether an advertisement expresses a discriminatory preference under an "ordinary reader" standard.  *Corey v. Sec'y, U.S. Dep't of Hous. & Urban Dev. ex rel. Walker*, 719 F.3d 322, 326 (4th Cir. 2013) (citing *United States v. Hunter*, 459 F.2d 205, 215 (4th Cir. 1972)).  "The ordinary reader is neither the most suspicious nor the most insensitive of our citizenry."  *Ragin v. N.Y. Times Co.*, 923 F.2d 995, 1002 (2d Cir. 1991).

Nothing in the contested Facebook advertisements in any way indicates that age could influence or affect the rental of the advertised properties.  JA70-84.  No advertisement indicates a discriminatory preference.  And Plaintiff cannot point to any feature of the advertisements' text or imagery as being at all discriminatory.  Rather, the advertisements describe the particular properties and provide a facially neutral, nondiscriminatory comment on each property.  For example:

- Bozzuto:  "At Central Apartments, everything you need is just a stone's throw away.  Discover what being CENTRAL means to you."  JA71.

- JBG Smith:  Atlantic Plumbing offers "apartments inspired by the artist lofts of New York City's meatpacking district . . . these aren't your cookie-cutter apartments in NW DC."  JA76.

- Kettler: Solaire Bethesda is a "Brand new luxury apartment community."  JA77.

42

- Tower: "Our spacious Studio-3 bedroom apartments offer you a unique living experience that will make you fall in love with our community. Call and schedule a tour today!" "Enjoy a Lifestyle of Zen and Luxury at The Pearl." JA81.

As a matter of law, no ordinary reader could view any of these advertisements as discriminatory. There is accordingly no well-pleaded MCC violation, and Plaintiff could not have been injured even if she had received the advertisements.

> **b.    Plaintiff Fails to Make a Plausible Allegation That Defendants' Overall Advertising Excludes Older Individuals.**

Plaintiff contends that Defendants violated MCC § 27-12 by targeting facially neutral Facebook advertisements to individuals in younger age brackets. Even if that allegation were true, it would not establish a violation of the statutory provision and thus Plaintiff, by definition, could not have suffered an injury in fact.

By its plain terms, the MCC addresses only an advertisement's content, not the distribution of advertisements. *See* MCC § 27-12(d) ("A person must not publish or circulate, or cause to be published or circulated, any housing notice, statement, listing, or advertisement . . . indicating that age could influence or affect [a covered real estate transaction].").

Courts recognize that advertising, by its very nature, targets groups of people, and any advertisement—and indeed, any product—may appeal to some

43

demographics more than others. *See Opiotennione v. Facebook, Inc.*, 3:19-cv-07185-JSC (N.D. Cal.), ECF No. 69 (Hrg. Tr. Aug. 13, 2020) at 10:7-9 ("there is no law that says you cannot target [an advertisement]"); *id.* at 43:20-22 ("I just feel like you're just saying you can't target ads at all; right? And I just think that's ludicrous."); *see also Opiotennione v. Facebook, Inc.*, 2020 WL 5877667, at *4 ("Under Plaintiff's theory, *any* person who was excluded from the possibility of receiving that advertisement because of her age would have standing. Not so."); *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 805 F. Supp. 2d 396, 408 (S.D. Ohio 2011), *jury verdict vacated on other grounds*, 725 F.3d 571, 581 (6th Cir. 2013) (facially discriminatory ads are *per se* violations of the FHA, but ads whose language merely target certain subgroups do not necessarily violate the law); *Metro. Milwaukee Fair Hous. Council v. Labor & Indus. Rev. Comm'n*, 496 N.W. 2d 159, 162 (Wis. Ct. App. 1992) ("Our inquiry is not limited to whether the effect of the advertisement is to dissuade some potential renters from applying. Most advertisements will tempt some and deter others. Rather, the correct inquiry is whether such dissuasion is the product of any discriminatory statement or indication in the advertisement.").

Even if the MCC could be stretched to address the distribution of facially nondiscriminatory ads, Plaintiff has failed to allege plausibly that Defendants' overall advertising did not reach a diverse audience. Her original complaint

challenged only certain individual Facebook advertisements rather than any Defendants' overall advertising campaigns. In amending her complaint following Defendants' original motion to dismiss, Plaintiff attempted to remedy this problem even though she lacked any facts that would allow her to do so. In particular, she altered her allegations to assert that, "[o]n information and belief," Defendants "did not take any action in publishing advertisements" to ensure their ad campaign "reached a balanced, diverse audience based on age" and that she was "unaware of any non-age-restricted advertising of the defendants' properties" on any platform that allows for age-restricted advertising. JA24-44 (¶¶ 45-98).

These information-and-belief allegations are speculative and conclusory and thus insufficient to support Plaintiff's claim of discrimination under the governing *Twombly/Iqbal* pleading standards. *See Friends of Lubavitch v. Baltimore Cnty.*, 421 F. Supp. 3d 146, 166 (D. Md. 2019) (dismissing civil rights claim by religious organization claiming county treated it differently than secular organizations but did not name a single institution or organization treated differently or attempt to find one in the public record); *Worsham v. Travel Options, Inc.*, No. JKB-14-2749, 2016 WL 4592373, at *5 (D. Md. Sept. 2, 2016), *aff'd*, 678 F. App'x 165 (4th Cir. 2017) (finding that the complaint made "naked assertions" and "conclusions, couched as factual allegations, [that] are insufficient to nudge the complaint against [corporate

officer defendant] 'across the line from conceivable to plausible'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 570 (2007))).

Indeed, as explained in the District Court and above, a basic Internet search shows that all four Defendants advertised on multiple websites and that Facebook ads were not the only portal through which Plaintiff could have easily learned about Defendants' available apartments and websites. JA87. Defendants' apartment listings on dozens of websites are available to the general public, and Plaintiff does not allege that Defendants' advertising as a whole excluded older people—merely that Defendants targeted certain Facebook advertisements to younger people.

Plaintiff's failure to provide any facts showing that any Defendant's advertising as a whole excluded older people is fatal to her discrimination claims. Further, even if the MCC could be stretched beyond its text to include distribution of nondiscriminatory advertisements, there are no well-pleaded facts that any of the Defendants engaged in a pattern of limiting advertising campaigns to any age demographic.

The case law treating targeted marketing shows that such advertising—even if based on a protected characteristic—is permissible as long as the overall advertising campaign reaches a diverse audience. *See United States v. Real Est. One, Inc.*, 433 F. Supp. 1140, 1152 (E.D. Mich. 1977) (ordering that real estate company maintain advertising in local newspaper whose primary circulation was among a

Black community and counterbalancing advertising for the same homes in other newspapers); *NAACP v. ITT Cmty. Dev. Corp.*, 399 F. Supp. 366 (D.D.C. 1975) (directing defendants to allocate set amount of funds from media advertising budget to advertising in national or local media which served primarily black and other minority populations).

Consistent with this, courts reject claims like Plaintiff's which are based on single or isolated ads rather than the overall scope of an ad campaign. *See Hous. Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Div. of Gannett Co.*, 943 F.2d 644, 648 (6th Cir. 1991) (concluding in part that a complaint alleging an FHA violation of based on the single publication of an advertisement with a small number of all-white models does not state a cognizable claim as a matter of law). Even the cases cited by Plaintiff in her opening brief included allegations about the entirety of the defendants' advertising, not single, stand-alone advertisements. *See Guevara v. UMH Props., Inc.*, No. 2:11-CV-2339-SHL-TMP, 2014 WL 5488918, at *6 (W.D. Tenn. Oct. 29, 2014) (advertising campaign that only advertised in Spanish language media resulting in "virtually all" tenants being Hispanic despite the county being predominately African American was sufficient to state an FHA claim); *Martinez v. Optimus Props., LLC*, No. 216CV08598SVWMRW, 2017 WL 1040743, at *5 (C.D. Cal. Mar. 14, 2017) (plaintiffs allegation that defendants only advertised on specific websites, all of which "target young, English-speaking, single, non-disabled people"

was sufficient to state an FHA claim). Notably, these cases were decided under the FHA's broader language, and even then, the allegations concerned the entirety of the defendants' advertising, rather than the isolated advertisements at issue here.

> ### c.    The "Why Am I Seeing This Ad" Statements Were Not Made by Defendants and Defendants Are Not Responsible for Facebook's Algorithm.

Plaintiff's contention that Facebook's "Why am I seeing this ad?" statements express a discriminatory preference also fails as a matter of law and fails to support a claim of injury caused by the Defendants. JA24-27 (¶¶ 47-51).

The Amended Complaint recognizes that all statements made in the "Why am I seeing this ad?" page are created and made by Facebook. JA17. Facebook generates the page and chooses what to include in it. As the Facebook page's name suggests, it purports to provide Facebook users with information about why *Facebook*, not the advertisers, has chosen their specific profile for a specific advertisement.

Facebook itself says that the ads are developed and assessed by Facebook relating to a specific user's activity on and off Facebook. Facebook develops the data that informs its ad targeting by tracking its users on Facebook and elsewhere on the Internet for Facebook's own marketing purposes. On its website, Facebook includes the following:

How we [Facebook] decide which ads to show you:

> We [Facebook] want the ads you see on Facebook to be as interesting and useful to you as possible.  These are examples of things we use to decide which ads to show you:
>
> • Your activity on Facebook (such as liking a Page or clicking on ads you see).
> • Other information about you from your Facebook account (example: your age, your gender, your location, the devices you use to access Facebook).
> • Information advertisers, their partners, and our marketing partners share with us that they already have, like your email address.
> • Your activity on websites and apps off of Facebook.  Learn more about how to turn this off in your ad settings.

Facebook Help Center, "How does Facebook decide which ads to show me?" (emphasis added) (retrieved August 21, 2020) (quoted at D. Ct. Dkt. 65-1, at 20-21).

Because, as Plaintiff has acknowledged, the "Why am I seeing this ad?" disclosure is made by Facebook, not advertisers, her claim against Defendants for statements made in that disclosure has no legal grounding.[10]

Plaintiff's claim that advertisers like Defendants can somehow be liable for Facebook's proprietary and undisclosed algorithm likewise lacks merit:  All

---

[10] Plaintiff acknowledged Facebook's sole responsibility for the disclosure and its algorithm in her prior lawsuit against Facebook in the Northern District of California.  *See Opiotennione v. Facebook, Inc.*, No. 3:19-cv-07185-JSC (N.D. Cal.), ECF No. 39 at 20 ("Facebook wholly creates these [very same] statements, as it exercises total control over 'whether to make the statement and on the relevant content and images in the statement.'"); *see also Opiotennione v. Facebook, Inc.*, No. 3:19-cv-07185-JSC (N.D. Cal.), ECF No. 30 at ¶ 78. (admitting that the "Why am I seeing this ad?" statement "is created, developed, and made by Facebook . . . [which] has complete discretion on whether to make the . . . statement and on the relevant content and images in the statement" and also admitting that advertisers only know that Facebook is making the statement in "some cases").

advertisers, by necessity, rely on a publication or website's distribution network. Facebook alone determines how its algorithm works and does not provide anyone, including Defendants, information sufficient to determine how it works. Therefore, Defendants cannot be liable for its results.

### 2.    The Amended Complaint Fails to Plausibly Allege Discrimination Under the DCHRA.

Plaintiff alleges in Count II of the Amended Complaint that Defendants' Facebook advertising violated the DCHRA in four ways: (1) by making an advertisement that unlawfully states a preference based on a protected class under D.C. Code § 2-1402.21(a)(5); (2) by unlawfully refusing or failing to initiate or conduct a transaction for real estate, or falsely representing "that an interest in real property is not available for transaction wholly or partially for a discriminatory reason based on the actual or perceived . . . age . . . of any individual" pursuant to § 2-1402.21(a)(1); (3) by aiding and abetting Facebook's violation of DCHRA pursuant to § 2-1402.62; and (4) by denying older individuals advertising and thereby "steering" them in violation of § 2-1402.22.  JA58-66 (¶¶ 152-66, 173-85).

Much as with the MCC, the Amended Complaint has failed to state a viable claim for discrimination under the DCHRA and thus fails to plausibly allege that she

has suffered an injury sufficient for standing based on the same.[11]  For the reasons set forth above, Plaintiff has not alleged any facts that demonstrate that Defendants have published ads that stated a discriminatory preference based on age.  *See supra* Section III.C.1.

In addition, DCHRA reaches only intentionally discriminatory acts. *Brandywine Apartments, LLC v. McCaster*, 964 A.2d 162, 167-68 (D.C. 2009) ("To establish a claim of intentional discrimination . . . the plaintiff must prove intentional and purposeful conduct based on his membership in a protected class." (emphasis omitted)).  Targeting some Facebook advertisements is not intentionally discriminatory, and Plaintiff has asserted no facts demonstrating that any Defendants intentionally discriminated against any individual, that they refused to initiate or

---

[11] Plaintiff's claim under the DCCPPA fails for a number of reasons, including that the core allegations—alleged discrimination related to housing advertisements—are addressed by a comprehensive statute with a full suite of protections and remedies: the DCHRA.  They are derivative of the DCHRA claims and are not independently actionable under the general consumer protection statute.  *See Gomez v. Indep. Mgmt. of Del., Inc.*, 967 A.2d 1276, 1285 (D.C. 2009) (applying specific statute rather than DCCPPA, noting that "[r]esisting the force of the better-fitted statute requires a good countervailing reason, and none appears here" (citation omitted)); *Feemster v. BSA Ltd. P'ship*, 471 F. Supp. 2d 87 (D.D.C. 2007), *aff'd in part, rev'd in part on other grounds*, 548 F.3d 1063 (D.C. Cir. 2008 (dismissing DCCPPA claim derivative of DCHRA claim); *Adler v. Vision Lab Telecomms., Inc.*, 393 F. Supp. 2d 35, 40 (D.D.C. 2005) (dismissing DCCPPA claim because "there is a federal statute which allows plaintiffs to sue defendants for transmitting faxes without express permission.  The Court sees no need to extend the already broad reach of the DCCPPA to allow plaintiffs to challenge conduct that is already covered by federal law").

conduct a transaction for real estate, or that they falsely represented that a housing opportunity was not available for a discriminatory reason.  Therefore, she has failed to meet her burden to plead a prima facie case that Defendants made and published their ads for discriminatory reasons.  *See Henneghan v. District of Columbia*, 916 F. Supp. 2d 5, 10-11 (D.D.C. 2013).

Plaintiff's aiding and abetting claims also fail because she has not and cannot allege an independent primary violation by Facebook.  *See Richardson v. Petasis*, 160 F. Supp. 3d 88, 138-39 (D.D.C. 2015) (an individual cannot be liable under the aiding and abetting provision of the DCHRA absent an underlying direct violation of the DCHRA (citing *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 576 (D.C. Cir. 2010))).  Thus, there was nothing for any Defendant to aid or abet.

Plaintiff's claim of discrimination under DCHRA, like her MCC claim fails as a matter of law and cannot support standing.

## IV.  Plaintiff's Policy Arguments Have No Bearing on This Case

Plaintiff's policy argument—that the District Court's order creates a "radical rule" that would be a gateway for advertisers to circumvent antidiscrimination laws by posting housing or employment openings on their websites while excluding large swaths of people from their advertising—is meritless.  Opening Br. 37.  For one thing, the Supreme Court has long cautioned that concerns that "no one would have standing" is not a reason to find standing.  *See, e.g., Schlesinger v. Reservists Comm.*

*to Stop the War*, 418 U.S. 208, 227 (1974) ("The assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing."). Besides, Plaintiff's argument here is complete hyperbole and ignores the basis for the District Court's ruling.

The fact that Plaintiff cannot allege standing here would in no way foreclose future suits by people who could actually allege a personalized injury caused by discriminatory advertising practices. Here, however, Plaintiff has not alleged that Defendants withheld information from older people across their advertising; she has only challenged Defendants' use of Facebook advertisements. There is no allegation that Defendants' overall advertising campaigns did not reach a diverse population of prospective residents. Plaintiff's hypothetical concern that housing providers could engage in a concerted effort to target all their ads for particular properties to exclude certain classes of individuals bears no resemblance to this case. There are no well-pleaded facts that any of the Defendants have engaged in any such conduct. Plaintiff offers only "information and belief" conjecture that is untethered to anything that Defendants have done. This case provides no occasion for Plaintiff's policy concern. That professed concern is simply an ill-advised invitation to revamp decades of Article III standing jurisprudence, which this Court should reject.

## **CONCLUSION**

For all these reasons, the Court should affirm the District Court's dismissal of

Plaintiff's Amended Complaint.

Dated:  February 15, 2022               Respectfully submitted,

/s/ Lynn E. Calkins (with permission)     /s/ Grace E. Speights
Lynn E. Calkins                          Grace E. Speights
Christine N. Walz                        Michael Burkhardt
Holland & Knight LLP                     Michael E. Kenneally
800 17th Street, N.W., Suite 1100        Morgan Lewis & Bockius LLP
Washington, DC  20006                    1111 Pennsylvania Avenue, N.W.
Telephone: (202) 955-3000                Washington, DC  20004
lynn.calkins@hklaw.com                   Telephone: (202) 739-3000
                                         grace.speights@morganlewis.com

Counsel for Bozzuto
Management Company                       Counsel for JBG Smith
                                         Management Services, LLC


/s/ W. Christian Moffitt (with permission)/s/ Michael Evan Jaffe (with permission)
W. Christian Moffitt                     Michael Evan Jaffe
Fox Rothschild LLP                       Jack McKay
10 Sentry Parkway, Suite 200             David C. Grossman
Blue Bell, PA  19422                     Pillsbury Winthrop Shaw Pittman LLP
Telephone: (610) 397-7073                1200 17th Street, N.W.
cmoffit@foxrothschild.com                Washington, DC  20036
                                         Telephone: (202) 663-8068
Counsel for Kettler Management Inc.      michael.jaffe@pillsburylaw.com

                                         Counsel for Tower
                                         Construction Group, LLC

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the Court's type-volume limits because, excluding the portions of this document exempted by Fed. R. App. R. 32(f), this brief contains 12,499 words.

I further certify that this brief complies with the Court's typeface and style requirements because it was been prepared in 14-point Times New Roman, a proportionately spaced typeface, using Microsoft Word.

Dated: February 15, 2022                    */s/ Grace E. Speights*
                                            Grace E. Speights

55

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 15th day of February, 2022, the foregoing

Response Brief of Appellees was served on counsel of record for all parties via the

Court's CM/ECF system.

*/s/ Grace E. Speights*
Grace E. Speights
