

*Issues & Appeals*

June 26, 2023

*Via electronic filing*

Patricia S. Connor, Clerk
U.S. Court of Appeals for the Fourth Circuit
1100 East Main Street, Suite 501
Richmond, VA 23219

Re:     **Opiotennione v. Bozzuto, No. 21-1919 (argued on Jan. 26 before Judges Niemeyer, Rushing, and Heytens) – Notice of supplemental authority under Rule 28(j)**

Dear Ms. Connor:

Last week, the Ninth Circuit held that there was Article III standing in a case raising nearly identical claims against Facebook. *Vargas v. Facebook*, 2023 WL 4145434 (9th Cir. 2023) (attached).

The plaintiff alleged that she was denied housing ads on Facebook based on a protected status when she "was ready, willing, and able to move." Op. 3. Although she did "not identify[] *specific* ads that [she] did not see," the court explained that "nothing in the case law requires that a plaintiff identify specific ads that she could not see when she alleges that an ad-delivery algorithm restricted her access to housing ads in the first place." Op. 4. If she "cannot prove that she was denied access to one or more paid ads, then her claims will fail on the merits—but they do not fail for lack of standing." Op. 5. Because she "allege[d] a concrete and particularized injury—deprivation of truthful information and housing opportunities"—the court held that she had standing. *Id.*

Judge Owens dissented, expressing his view that the plaintiff needed to "allege that a housing ad that would otherwise have appeared in [her] News Feed[] … did not appear because the advertiser used [Facebook] to exclude [her] protected class." Dissent 1. Because the complaint "does not identify any such ad or advertiser," he believed that she lacked standing. *Id.*

Here, there is standing even under Judge Owens' reasoning because Ms. Opiotennione identifies specific ads by the defendants that she was not permitted to see because of her age. As she has explained, being personally subjected to unequal treatment is itself an injury. But she goes further than that: "She alleges that she was denied equal access to information about housing; that this denial caused her to miss out on six specific rental opportunities she otherwise would have applied to, qualified for, and obtained; and that this unequal treatment caused her stigmatic harm." Reply 6. At this stage, that's more than enough. She "need not definitively prove her injury or disprove [the defendants'] defenses." *Tyler v. Hennepin Cty.*, 143 S. Ct. 1369, 1374-75 (2023).

Respectfully submitted,

*/s/ Jonathan E. Taylor*
*Counsel for Plaintiff-Appellant*

Gupta Wessler PLLC
2001 K Street, NW, Suite 850 North, Washington, DC 20006
P 202 888 1741    F 202 888 7792
guptawessler.com

**NOT FOR PUBLICATION**

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

**FILED**

JUN 23 2023

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

ROSEMARIE VARGAS; et al.,

    Plaintiffs-Appellants,

 and

NEUHTAH OPIOTENNIONE; JESSICA TSAI,

    Plaintiffs,

  v.

FACEBOOK, INC.,

    Defendant-Appellee.

No. 21-16499

D.C. No. 3:19-cv-05081-WHO

MEMORANDUM*

Appeal from the United States District Court
for the Northern District of California
William Horsley Orrick, District Judge, Presiding

Argued and Submitted July 28, 2022
Withdrawn January 9, 2023
Resubmitted June 20, 2023
San Francisco, California

Before: M. MURPHY,** GRABER, and OWENS, Circuit Judges.
Dissent by Judge OWENS.

---

    * This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

    ** The Honorable Michael R. Murphy, United States Circuit Judge for the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

Plaintiffs Rosemarie Vargas, Jazmine Spencer, Kisha Skipper, Deillo Richards, and Jenny Lin appeal from the dismissal of their Third Amended Class Action complaint against Defendant Facebook, Inc. We review the dismissal de novo, Meland v. Weber, 2 F.4th 838, 843 (9th Cir. 2021), and reverse and remand for further proceedings.

1. The district court erred by dismissing the operative complaint for failure to allege a concrete injury sufficient to confer Article III standing. Under Federal Rule of Civil Procedure 12, the bar to allege standing is not high. See Maya v. Centex Corp., 658 F.3d 1060, 1068 (9th Cir. 2011) (holding that "Twombly and Iqbal are ill-suited to application in the constitutional standing context"); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." (brackets omitted) (citation and internal quotation marks omitted)). And we must accept all factual allegations as true. See Warth v. Seldin, 422 U.S. 490, 501 (1975) ("For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.").

The operative complaint alleges that Facebook's "targeting methods provide

tools to exclude women of color, single parents, persons with disabilities and other protected attributes," so that Plaintiffs were "prevented from having the same opportunity to view ads for housing" that Facebook users who are not in a protected class received.

Plaintiff Vargas provides an example. She alleges that she is a disabled female of Hispanic descent and a single parent living in New York City with her two minor children and that she is a frequent Facebook user who has posted photos of herself and her children. Because of her use of Facebook, the platform knew that she was "a single parent, disabled female of Hispanic descent." She sought housing from August 2018 through April 2019 and was ready, willing, and able to move. In an effort to find housing, she accessed the Facebook Marketplace. Although she sought housing in Manhattan, her Facebook searches yielded no ads for housing in Manhattan. After receiving unsatisfactory search results, in early 2019, Plaintiff Vargas sat side by side with a Caucasian friend "and conducted a search for housing through Facebook's Marketplace, both using <u>the same search criteria</u> . . . . [The Caucasian friend] received more ads for housing in locations that were preferable to Plaintiff Vargas. Plaintiff Vargas <u>did not receive the ads</u> that [the friend] received." Third Am. Compl. at 24 (emphases added). In other words, her Caucasian friend saw more, and more responsive, ads than Plaintiff Vargas received even though they used <u>identical</u> search criteria. <u>See</u> <u>Havens</u>

Realty Corp. v. Coleman, 455 U.S. 363, 373–74 (1982) (holding that racially diverse "testers" attempting to obtain truthful information about available housing had standing to sue under the Fair Housing Act of 1968).

The district court faulted the complaint for not identifying <u>specific</u> ads that Plaintiff Vargas did not see. But Plaintiffs' very claim is that Facebook's practices <u>concealed</u> information from housing-seekers in protected classes. And nothing in the case law requires that a plaintiff identify specific ads that she could not see when she alleges that an ad-delivery algorithm restricted her access to housing ads in the first place.

The district court also relied on the fact that only paid ads used Facebook's targeting methods, and Plaintiffs do not specify whether the ads that Plaintiff Vargas's Caucasian friend saw (and that Plaintiff Vargas did not) were paid ads. The operative complaint alleges that Facebook hosts a vast amount of paid advertising but does not allege that all ads on the Marketplace are paid ads. Nonetheless, given the allegations concerning the magnitude of paid advertising, it is plausible to infer that one or more of the ads that Plaintiff Vargas could not access because of Facebook's methods was paid. If Plaintiff Vargas cannot prove that she was denied access to one or more paid ads, then her claims will fail on the merits—but they do not fail for lack of standing. See <u>Cath. League for Religious & Civil Rts. v. City & County of San Francisco</u>, 624 F.3d 1043, 1049 (9th Cir.

2010) (en banc) ("Nor can standing analysis, which prevents a claim from being adjudicated for lack of jurisdiction, be used to disguise merits analysis, which determines whether a claim is one for which relief can be granted if factually true."). Plaintiff Vargas alleges a concrete and particularized injury—deprivation of truthful information and housing opportunities—whether or not she can establish all the elements of her claims later in the litigation.

    2. The district court also erred by holding that Facebook is immune from liability pursuant to 47 U.S.C. § 230(c)(1). "Immunity from liability exists for '(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a [federal or] state law cause of action, as a publisher or speaker (3) of information provided by another information content provider.'" Dyroff v. Ultimate Software Grp., 934 F.3d 1093, 1097 (9th Cir. 2019) (quoting Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1100 (9th Cir. 2009)). We agree with Plaintiffs that, taking the allegations in the complaint as true, Plaintiffs' claims challenge Facebook's conduct as a co-developer of content and not merely as a publisher of information provided by another information content provider.

    Facebook created an Ad Platform that advertisers could use to target advertisements to categories of users. Facebook selected the categories, such as sex, number of children, and location. Facebook then determined which categories applied to each user. For example, Facebook knew that Plaintiff Vargas fell within

5

the categories of single parent, disabled, female, and of Hispanic descent. For some attributes, such as age and gender, Facebook requires users to supply the information. For other attributes, Facebook applies its own algorithms to its vast store of data to determine which categories apply to a particular user.

The Ad Platform allowed advertisers to target specific audiences, both by including categories of persons and by excluding categories of persons, through the use of drop-down menus and toggle buttons. For example, an advertiser could choose to exclude women or persons with children, and an advertiser could draw a boundary around a geographic location and exclude persons falling within that location. Facebook permitted all paid advertisers, including housing advertisers, to use those tools. Housing advertisers allegedly used the tools to exclude protected categories of persons from seeing some advertisements.

As the website's actions did in <u>Fair Housing Council of San Fernando Valley v. Roommates.com, LLC</u>, 521 F.3d 1157 (9th Cir. 2008) (en banc), Facebook's own actions "contribute[d] materially to the alleged illegality of the conduct." <u>Id.</u> at 1168. Facebook created the categories, used its own methodologies to assign users to the categories, and provided simple drop-down menus and toggle buttons to allow housing advertisers to exclude protected categories of persons. Facebook points to three primary aspects of this case that arguably differ from the facts in <u>Roommates.com</u>, but none affects our conclusion

that Plaintiffs' claims challenge Facebook's own actions.

First, in Roommates.com, the website required users who created profiles to self-identify in several protected categories, such as sex and sexual orientation. Id. at 1161. The facts here are identical with respect to two protected categories because Facebook requires users to specify their gender and age. With respect to other categories, it is true that Facebook does not require users to select directly from a list of options, such as whether they have children. But Facebook uses its own algorithms to categorize the user. Whether by the user's direct selection or by sophisticated inference, Facebook determines the user's membership in a wide range of categories, and Facebook permits housing advertisers to exclude persons in those categories. We see little meaningful difference between this case and Roommates.com in this regard. Facebook was "much more than a passive transmitter of information provided by others; it [was] the developer, at least in part, of that information." Id. at 1166. Indeed, Facebook is more of a developer than the website in Roommates.com in one respect because, even if a user did not intend to reveal a particular characteristic, Facebook's algorithms nevertheless ascertained that information from the user's online activities and allowed advertisers to target ads depending on the characteristic.

Second, Facebook emphasizes that its tools do not require an advertiser to discriminate with respect to a protected ground. An advertiser may opt to exclude

7

only unprotected categories of persons or may opt not to exclude any categories of persons. This distinction is, at most, a weak one. The website in Roommates.com likewise did not <u>require</u> advertisers to discriminate, because users could select the option that corresponded to <u>all</u> persons of a particular category, such as "straight or gay." <u>See, e.g.</u>, <u>id.</u> at 1165 ("Subscribers who are seeking housing must make a selection from a drop-down menu, again provided by Roommate[s.com], to indicate whether they are willing to live with 'Straight or gay' males, only with 'Straight' males, only with 'Gay' males or with 'No males.'"). The manner of discrimination offered by Facebook may be less direct in some respects, but as in Roommates.com, Facebook identified persons in protected categories and offered tools that directly and easily allowed advertisers to exclude all persons of a protected category (or several protected categories).

Finally, Facebook urges us to conclude that the tools at issue here are "neutral" because they are offered to all advertisers, not just housing advertisers, and the use of the tools in some contexts is legal. We agree that the broad availability of the tools distinguishes this case to some extent from the website in Roommates.com, which pertained solely to housing. But we are unpersuaded that the distinction leads to a different ultimate result here. According to the complaint, Facebook promotes the effectiveness of its advertising tools specifically to housing advertisers. "For example, Facebook promotes its Ad Platform with 'success

8

USCA4 Appeal: 21-1919      Doc: 85         Filed: 06/26/2023    Pg: 10 of 12

Case: 21-16499, 06/23/2023, ID: 12741812, DktEntry: 76-1, Page 9 of 11

(9 of 11)

stories,' including stories from a housing developer, a real estate agency, a mortgage lender, a real estate-focused marketing agency, and a search tool for rental housing." A patently discriminatory tool offered specifically and knowingly to housing advertisers does not become "neutral" within the meaning of this doctrine simply because the tool is also offered to others.

**REVERSED and REMANDED.**

(10 of 11)

USCA4 Appeal: 21-1919    Doc: 85    Filed: 06/26/2023    Pg: 11 of 12

Case: 21-16499, 06/23/2023, ID: 12741812, DktEntry: 76-1, Page 10 of 11

FILED

JUN 23 2023

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*Vargas v. Facebook, Inc.*, No. 21-16499
OWENS, Circuit Judge, dissenting:

I respectfully dissent. Each of Plaintiffs' theories of injury—denial of truthful information, denial of the opportunity to obtain a benefit, denial of the social benefit of living in an integrated community, and stigmatic injury—depends on Plaintiffs having been personally discriminated against by at least one housing advertiser that used Facebook's Ad Platform. Thus, to survive a motion to dismiss, Plaintiffs would need to plausibly allege that a housing ad that would otherwise have appeared in their News Feeds or in their search results on Facebook Marketplace did not appear because the advertiser used Facebook's Ad Platform to exclude their protected class. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

As to each named plaintiff, the Third Amended Complaint ("TAC") does not identify any such ad or advertiser. Nor does it allege facts supporting an inference that housing discrimination (even if the identities of the ads and advertisers are unknown) is plausibly the reason Plaintiffs failed to find housing ads meeting their respective search criteria. Plaintiffs have alleged nothing to exclude the possibility that suitable housing was not available or not advertised on Facebook. *See Iqbal*, 556 U.S. at 682 (finding that an allegation of discrimination was not plausible in view of one "obvious alternative explanation").

1

Although Vargas alleges in Paragraph 95 of the TAC that her Caucasian friend, while using the same search criteria, received ads on Facebook Marketplace that she did not, she does not specify whether the ads her Caucasian friend saw were user-generated or paid (i.e., created using the Ad Platform and its audience selection tools). Users can distinguish paid ads from user-generated ads by the label "Sponsored." *See* Andrew Hutchinson, *Facebook Provides New Option to Boost Marketplace Posts, and Marketplace Ads for Businesses*, SocialMediaToday (June 7, 2018), https://www.socialmediatoday.com/news/facebook-provides-new-option-to-boost-marketplace-posts-and-marketplace-ad/525158/. Only paid ads are relevant to Vargas's housing discrimination claims.

Accordingly, I would affirm the district court's dismissal for failure to allege a concrete injury sufficient to confer standing.